Submitted on record and briefs April 7, affirmed December 13, 2006

In the Matter of G&N Land Exchange.

Pamela BIRMINGHAM,
Jeffrey Birmingham, Carolyn Eady,
and Bhagwati P. Poddar,
*Petitioners,*

*v.*

DEPARTMENT OF FORESTRY,
Kent Grewe, Martin Nygaard,
and Marcia K. Denison,
*Respondents.*

103642; A126396

149 P3d 600

737-a

James D. Brown and Cascade Resources Advocacy Group filed the opening brief for petitioners. On the reply brief was Ralph O. Bloemers.

Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Denise G. Fjordbeck, Assistant Attorney General, filed the brief for respondents Department of Forestry, Kent Grewe, and Martin Nygaard.

Marcia K. Denison filed the briefs *pro se*.

Before Linder, Presiding Judge, and Wollheim, Judge, and Richardson, Senior Judge.

RICHARDSON, S. J.

**RICHARDSON, S. J.**

Petitioners seek review of the amended final order of the Board of Forestry (board) approving a land exchange between the Oregon Department of Forestry (ODF) and private landowners Kent Grewe and Martin Nygaard (G&N). Petitioners argue that the board's order failed to comply with administrative rules governing land exchanges and failed to explain why ODF undertook actions that were inconsistent with ODF's prior practice.[1] We affirm.

The board supervises "all matters of forest policy and management" under the state's jurisdiction, ORS 526.016(1), and provides direction to the state forester, who serves as secretary to the board and chief executive officer of ODF. ORS 526.008; ORS 526.031(1). State law authorizes the board to "acquire, by purchase, donation, devise or exchange * * * lands which by reason of their location, topographical, geological or physical characteristics are chiefly valuable for the production of forest crops, watershed protection and development, erosion control, grazing, recreation or forest administrative purposes." ORS 530.010(1). To render management of state forests "more economically feasible," the board is encouraged to consolidate its holdings "wherever possible through exchanges" of land, ORS 530.040(1), or "the timber on such land" for land of "approximately equal aggregate value." ORS 530.040(2). To comply with that equal value requirement, the board is authorized to "provide or receive * * * a monetary consideration[.]" *Id*. ODF rules direct that the value of assets received by the state in an exchange must be at least equal to the value of property transferred, unless the board finds that unusual circumstances exist. OAR 629-033-0045(1). In assessing the value of the parcels to be exchanged, ODF is required to conduct "a biological

---

[1] We consider only the arguments of petitioners Pamela Birmingham, Jeffrey Birmingham, Carolyn Eady, and Bhagwati Poddar to challenge the Board's order approving the land exchange. Petitioner Marcia Denison also petitioned for judicial review, but because her petition was not timely, we admitted her briefs as those of a respondent.

assessment of plant and wildlife resources" and a "recreational resource assessment." OAR 629-033-0045(2).[2]

Rules further specify that a land exchange is "appropriate" when (1) the lands to be acquired are "chiefly valuable for the production of forest crops, watershed protection and development, erosion control, grazing, recreation or forest administrative purposes," (2) "[t]he exchange furthers the objectives of providing a full range of social, economic and environmental benefits * * * for achieving greatest permanent value * * * as expressed in approved forest management plans," and (3) "[t]he transaction results in the consolidation of state forest lands" or renders their management "more economically feasible." OAR 629-033-0010. In determining whether a proposed exchange furthers those purposes, the board is permitted to consider the assessments of biological and recreational resources that were conducted to aid the valuation of parcels required to ensure an equal exchange. OAR 629-033-0045(2).

In the present case, we take the basic facts from the board's final order and portions of the record cited in that order.[3] In April 1998, ODF and G&N entered into an exchange agreement under which ODF would transfer to G&N five parcels of state land within the Clatsop State Forest region, south and east of Astoria, and receive from G&N five other parcels within the same region. Pursuant to ODF rules, fulfillment of the agreement was contingent on board approval. OAR 629-033-0025(4). ODF's contribution to the exchange comprises the 136-acre Luukinen parcel, the

---

[2] OAR 629-033-0045(2) provides:

"In assessing the value of lands to be given or acquired, the Department will conduct a biological assessment of plant and wildlife resources on the parcel(s), and a recreational resource assessment of the parcel(s) for the purpose of determining if the transaction furthers the purposes of OAR 629-033-0010 and the goals and objectives of Forest Management Plans. The assessment of biological and wildlife resources on the parcels shall be conducted by a qualified independent third party mutually agreeable to the transaction partners. The Board may consider such assessments in making its determination as to whether the proposed transaction furthers the purposes set out in OAR 629-033-0010."

[3] The argumentative nature of the statement of facts in petitioners' opening brief renders it unhelpful to our understanding of the case and is not consistent with ORAP 5.40(8).

81-acre Claremont parcel, and three properties totaling 78.46 acres called the John Day parcels. The total ODF contribution is 295.46 acres. The G&N contribution comprises the 77-acre Christian Retreat parcel, the 239-acre Rankin parcel, the 11-acre Grimstad parcel, the 37-acre Beneke Creek parcel, and the 43-acre Cornish parcel. That contribution totals 407 acres.

A February 1999 appraisal by an independent consultant valued the 295.46 acres of land to be contributed by ODF at $1,260,000 and the 407 acres of land to be contributed by G&N at $999,500. According to ODF's principal negotiator, ODF initially proposed to equalize the value of the exchange by reserving the timber on 63 acres of the Luukinen Parcel, whose value had been estimated by the independent consultant to be equivalent to the difference in the value of the exchange properties, about $260,500. Because the market for timber was on the upswing, ODF considered holding the timber for sale at a future time when it could maximize the return to the state. G&N, however, preferred to complete the transaction and not encumber the Luukinen Parcel with a state timber reserve. In December 1999, ODF contracted for a new appraisal of the value of the 63-acre timber reserve, on the basis of an assumption that the timber would be "offered on the open market as a standard State timber sale with a 3-year contract term." On the basis of the range of estimated returns derived by a consultant utilizing different pricing methods for projecting timber sales, ODF estimated the value of the timber reserve to be $326,000. Still seeking an exchange that left it free of any state timber encumbrance, G&N agreed that, if the Board would accept a cash payment to equalize values, they would pay the state $326,000 in addition to delivery of the land.

The exchange on that basis was deferred, however, while the board completed deliberations and approval of a forest management plan for western Oregon state forests (approved January 2001) and a new policy on land acquisition and exchange (adopted September 2001). During that period of deferrals the timber market substantially declined. ODF became concerned that the previously estimated difference in property values had been eliminated, largely because the valuation of the state parcels was more closely tied to its

stands of timber than was true of the less-heavily forested properties to be contributed to the exchange by G&N. However, on the basis of its own analysis that the original appraisal reflected log prices in a "normal" market year, ODF rejected G&N's suggestion that a new appraisal of the properties be done and successfully pressed for a return to the original terms of the exchange. Accordingly, ODF secured G&N's agreement that the exchange could proceed if it included, at the board's option, either the originally considered 63-acre timber reservation or a $260,500 cash payment from G&N. A public hearing on the exchange had been conducted in July 2000. As previously noted, in September 2001 the board approved new rules for land exchanges. ODF decided to apply those new rules to the exchange with G&N and contracted for independent biological and recreational assessments of the exchange properties.[4] A second public hearing was concluded in April 2002, at which "the updated terms and additional assessments related to the proposed land exchange were presented and discussed."

The exchange agreement was submitted to the board for approval, pursuant to OAR 629-033-0025(4), on September 4, 2002.[5] The board found that extraordinary circumstances justified the term of exchange under which G&N was to make an equalization payment that would be in excess of 25 percent of the appraised value of the property that the state would acquire; the board then approved the terms of the exchange as a whole. *See* OAR 629-033-0035.[6]

---

[4] OAR 629-033-0045(2) leaves to ODF whether it should contract with an independent third party to conduct a recreational resource assessment of exchange lands or conduct that assessment itself. For the present land exchange ODF contracted for an independent recreational resource assessment, as well as for an independent biological resource assessment.

[5] The exchange also had been approved by the Clatsop County Commission on August 14, 2002.

[6] OAR 629-033-0035 provides:

"The Department may consider the receipt of land, monetary consideration, or other assets to equalize values of the parcels being exchanged. The Department must, however, receive approval in concept from the Board of Forestry when the proposed monetary payment exceeds ten percent of the value of the parcel(s) being acquired. In no event shall monetary compensation exceed 25 percent of the appraised value of the acquired property, unless the Board finds extraordinary circumstances exist that necessitate the exchange."

Petitioners participated in the public hearing process, filed comments, and timely filed a request for a contested case hearing. That was conducted in May 2003 before an administrative law judge (ALJ). In August 2003, the ALJ issued a proposed order that ruled in favor of the land exchange on 10 of 11 issues. The ALJ disagreed with the board's finding that extraordinary circumstances justified an equalization payment in excess of 25 percent of the value of the property to be received, but advised that with a "very slight adjustment in the terms of the exchange," the required equalization payment would be below the 25 percent threshold and would allow the exchange to be approved without a finding of extraordinary circumstances.

Both ODF and petitioners filed exceptions to the proposed order and subsequently provided written and oral argument to the board. In October 2003, ODF brought a modified proposal before the board that included a small timber reservation and a concomitant $10,700 reduction in the cash equalization payment to be made by G&N. Those changes reduced the new proposed equalization payment to a level below the 25 percent threshold. On January 29, 2004, following oral argument, the board approved the exchange, as modified. Petitioners timely filed for reconsideration. On August 23, 2004, the board issued its amended final order, holding in favor of the exchange on all issues it addressed.[7] Petitioners then filed for judicial review to this court.

On judicial review, petitioners advance four assignments of error: (1) the board erred in failing to first approve the exchange in concept in a separate proceeding before approving the final exchange including the cash payment provisions; (2) the board erred in concluding that the proposed exchange is for equal value; (3) the board erred in concluding that the proposed exchange complies with the requirement to provide a full range of social, economic, and environmental benefits so as to achieve the greatest permanent value for the people of Oregon; and (4) the board failed

---

[7] The board also found that ODF's revisions to the exchange agreement rendered moot petitioners' challenge to the ALJ's earlier determination that the board had erred in finding that extraordinary circumstances justified an equalization payment in excess of 25 percent of the value of lands to be acquired in the exchange.

to explain why it undertook actions that were inconsistent with its prior practices.

■ In the first assignment, petitioners contend that the board's action in approving the exchange violated OAR 629-033-0025(2), which provides that exchanges that include an equalization payment "in excess of ten percent of the value of the parcel(s) being acquired shall first be approved in concept" by the board.[8] Petitioners argue that the board's approval of the concept and final approval of the exchange were given in the same meeting, in violation of the provision.[9] ODF responds that the relevant rules governing approval of an exchange agreement required only that ODF undertake a two-step process—receive approval of the cash component, and receive approval of the exchange as a whole—and that conceptual approval need not be undertaken at a different time.

■■ Petitioners' arguments challenge the board's interpretation of OAR 629-033-0025(2). We review that assignment for errors of law. ORS 183.482(8)(a).[10] Administrative

---

[8] OAR 629-033-0025 provides:

"(1) Exchanges of state forest lands between counties shall first be approved by the County Court or Board of County Commissioners of the counties affected.

"(2) All exchanges of state forest land that require a monetary payment in excess of ten percent of the value of the parcel(s) being acquired shall first be approved in concept by the Board of Forestry.

"(3) All acquisitions of forest lands proposed for ownership by the Board and designation as state forest lands must have approval of the County Court or Board of County Commissioners of the county affected.

"(4) All acquisitions or exchanges involving state forest lands shall be submitted to the Board for final approval prior to execution of deeds which consummate the transaction.

"(5) The Department shall obtain approval by the Attorney General of the title to all lands to be received in accordance with ORS 530.020."

[9] Petitioners also appear to advance the position, but without developing an argument to support it, that, at its September 4, 2002, meeting, the board never actually approved the exchange involving a greater than 10 percent equalization payment "in concept," even though at that meeting the board expressly determined that extraordinary conditions necessitated completion of the exchange with an equalization payment exceeding 25 percent of the value of properties to be received. We reject that argument without comment.

[10] ORS 183.482(8) provides:

"(a) The court may affirm, reverse or remand the order. If the court finds that the agency has erroneously interpreted a provision of law and that a correct interpretation compels a particular action, it shall:

rules are interpreted under the same analytical framework that we apply when construing statutes. *Thomas Creek Lumber v. Board of Forestry*, 188 Or App 10, 22, 69 P3d 1238 (2003). We give deference to an agency's interpretation of its own rule if it is not "inconsistent with the wording of the rule itself, or with the rule's context, or with any other source of law[.]" *Don't Waste Oregon Com. v. Energy Facility Siting*, 320 Or 132, 141, 881 P2d 119 (1994).

Petitioners argue that, in its final amended order, the board failed even to determine that it had complied with OAR 629-033-0025(2), and instead merely determined that it had satisfied the "intent" of the rule. Although petitioners do not expressly state their aim in raising this argument, we view it as a challenge to the adequacy of the board's explanation for its judgment that it complied with the relevant rules. We note, in any event, that the question of the board's compliance with OAR 629-033-0025(2) was not among the 11 issues decided by the ALJ in his proposed final order because, as the board noted, that particular issue had been struck by the ALJ as unpreserved.[11] Without stating whether it deemed the ALJ to have properly struck the contention, the board noted that:

"The approval in concept rule is intended to provide the Board with advance notice of exchange proposals that involve significant cash payments, and the opportunity to

---

"(A) Set aside or modify the order; or

"(B) Remand the case to the agency for further action under a correct interpretation of the provision of law.

"(b) The court shall remand the order to the agency if it finds the agency's exercise of discretion to be:

"(A) Outside the range of discretion delegated to the agency by law;

"(B) Inconsistent with an agency rule, an officially stated agency position, or a prior agency practice, if the inconsistency is not explained by the agency; or

"(C) Otherwise in violation of a constitutional or statutory provision.

"(c) The court shall set aside or remand the order if it finds that the order is not supported by substantial evidence in the record. Substantial evidence exists to support a finding of fact when the record, viewed as a whole, would permit a reasonable person to make that finding."

[11] On appeal, ODF concedes that petitioners had, in fact, adequately preserved the issue of the board's compliance with OAR 629-033-0025(2), and we agree.

give the Department direction on such proposals before significant time and effort is spent. The rule does not state when approval in concept must be sought. In the present case, the Board heard protests and was advised of the status of the transaction on numerous occasions. The approval in concept rule's intent was achieved."

When read in full, it is clear that the board's limited discussion of the issue determined not only that the "rule's intent was achieved," but also that "[t]he rule does not state when approval in concept must be sought." Contrary to petitioners' characterization, the board's discussion of the question whether it had complied with the approval in concept rule is consistent with ODF's argument on review, namely, that the board was not constrained by its rules to give conceptual approval at a prior meeting.[12]

We turn, then, to the question whether the board's approval of the exchange in fact complied with OAR 629-033-0025(2). Petitioners construe that provision to require the board to consider the "concept" of such an exchange at a time sufficiently prior to the meeting at which the board considers giving final approval, so as to give the public and the board "the opportunity to meaningfully deliberate and comment on whether the cash payment option that was promoted by ODF was the best course of action." Petitioners argue that such an interpretation of OAR 629-033-0025(2) is required by the phrase "shall first be approved in concept," as well as by the relevant context, namely the policy of ensuring a significant role for the public in the exchange process that underlies the public hearing rule, OAR 629-033-0030.[13]

---

[12] In particular, ODF here argues that the board properly "construed its rules to require that a two-step process be undertaken: approval of the cash component, and approval of the exchange as a whole. The board complied with that process. Nothing more was required."

[13] OAR 629-033-0030 provides, in part:

"(1) As required by ORS 530.040(3), a public hearing on all acquisitions or exchanges of state forest land shall be held at the courthouse of the county or counties in which the lands are situated.

"(2) Notice of such hearing shall be given by publication * * * not less than 30 days prior to the date of the hearing.

"(3) * * * The notice shall * * * indicate how and where to obtain detailed maps outlining the exact location of the parcels involved and staff analysis of the transaction.

In assessing petitioners' argument, we note that the question before us is not whether petitioners' interpretation of OAR 629-033-0025(2) is plausible, or even whether it is preferable to the construction advanced by the board, but rather whether, as petitioners assert, the board's interpretation of that provision is inconsistent with the relevant rules and statutes.

By its terms, the phrase "shall first be approved in concept," OAR 629-033-0025(2), does not specify what this "first approval" must precede or when procedurally it must occur. Put another way, if such an exchange "shall first be approved in concept," what is it that must next—or secondly, or lastly—be approved, whether in concept or otherwise? Read as a whole, OAR 629-033-0025 does not fully prescribe a set of consecutively ordered steps that ODF must follow in the process. But, as ODF argues, the provisions may be read consistently to denote or reference the same "penultimate step." Thus, OAR 629-033-0025(4) requires that "[a]ll acquisitions or exchanges involving state forest lands shall be submitted to the Board for final approval prior to execution of deeds which consummate the transaction." Other provisions of the rule require that other steps be undertaken prior to final action by the board. OAR 629-033-0025(1) requires that, in the event that exchange properties lie within different counties, the exchange "shall first be approved by the County Court or Board of County Commissioners of the counties affected." OAR 629-033-0025(1). Likewise, OAR 629-033-0025(3) requires that all "acquisitions of forest lands proposed for ownership by the Board and designation as state forest lands" must receive approval by "the county affected." Similarly, OAR 629-033-0025(5) directs ODF to "obtain approval by the Attorney General of the title to all lands to be received * * *."

Each of the aforementioned approvals requires action by a governmental agency other than the board. Of necessity, then, those actions will be taken separately from

---

"(4) The 30-day notice required for public comment * * * will commence on the date of the hearing described in subsection (2) above, and will run for 30 days. Public comments must be submitted by the closing of the public comment period and shall be sent to the State Forester's office in Salem."

the board's action in granting final approval to the exchange. OAR 629-033-0025(2), on the other hand, provides that "the board" must first approve the concept of an exchange requiring an equalization payment before the board gives its final approval to the exchange as a whole. We conclude that the board's construction of OAR 629-033-0025(2) is plausible and consistent with the other provisions of OAR 629-033-0025. Nothing in any of the provisions of that rule requires the board to approve the concept of an equalization payment—or, as the board reads the requirement, to approve the cash component of the exchange—at a separate and earlier meeting of the board.[14]

Petitioners also argue that the public hearing rule, OAR 629-033-0030, constitutes part of the context for interpreting OAR 629-033-0025. We agree. However, nothing in OAR 629-033-0030 requires the board to approve the concept of an equalization payment at a separate and prior meeting from the meeting at which the board approves the exchange as a whole. ODF stresses that, while OAR 629-033-0030(1) directs that "a public hearing on all acquisitions or exchanges of state forest land shall be held," OAR 629-033-0030(1) does not require that the public be notified of any potential cash equalization payment involved in the exchange.[15]

Petitioners argue, however, that as a functional matter the board's failure to consider at an earlier meeting the cash component of the exchange left the public in ignorance of that aspect of the deal, ignorance fostered by "ODF staff [who] told the public at the final public hearing that the exchange would involve a timber reservation to equalize value as opposed to the option of a cash component." ODF points out that it in fact had informed the public at both the July 2000 and April 2002 hearings that a cash payment from

---

[14] As previously discussed, 209 Or App at 743 n 9, the board construed the requirement to approve the concept of an exchange requiring a cash component exceeding 10 percent of the value of acquired properties to be satisfied by its specific and separate approval of the cash component of the exchange, totally $260,500, at its September 4, 2002, meeting.

[15] The rule does require, however, that the notice of the hearing include "a description of lands to be given and received," as well as an indication of "how and where to obtain detailed maps outlining the exact location of the parcels involved and staff analysis of the transaction." OAR 629-033-0030(3).

G&N was an option to equalize values in the exchange. On the basis of our review of the relevant portion of the record, we agree with ODF. In particular, at the April 17, 2002, hearing, ODF representative Bill Lecture several times addressed the issue of a cash component of the proposed exchange. He expressly clarified during both hearings that reserving the timber on 63 acres and later selling it at auction was but "one of the options we have," and that another option was that one of the exchange partners could "exercise a buyout option for the same price we would sell it." ODF adequately apprised the public that the exchange might include such a cash payment. The public had a meaningful opportunity—both during the portion of the April 2002 hearing reserved for public comment and during the subsequent 30-day period in which the record was held open for written comments—to convey timely objections to the board about an exchange agreement that potentially required a cash equalization payment of $260,500.[16] We reject petitioners' first assignment of error.

In their second assignment, petitioners assert that the board erred in concluding that the exchange was for equal value, as required by OAR 629-033-0045(1).[17] Petitioners' arguments in support of this assignment do not challenge the board's construction of OAR 629-033-0045(1), but instead turn on an interpretation of the facts in the record. Accordingly, we review this assignment of error for substantial evidence.[18] ORS 183.482(8)(c).

Petitioners argue that ODF's assessment that the value it would receive in the exchange would meet or exceed the value of the properties that it intended to trade was

[16] In light of that conclusion, we do not need to consider ODF's alternative argument that "[e]ven if petitioners had not been informed that a cash payment was under consideration, nothing in the rules requires that the exact terms of a proposed exchange be made public."

[17] OAR 629-033-0045 provides, in part:

"(1) The value of any asset in an acquisition, including land, timber and other assets, is equal to the price a prudent purchaser would pay in accordance with accepted appraisal practices. Unless the Board of Forestry finds that unusual circumstances exist, the value received by the Department in an acquisition or exchange shall not equal less than the value of the property transferred."

[18] In undertaking a review of the facts in the record, we are not permitted to substitute our own judgment for that of the board. ORS 183.482(7).

flawed because (1) the appraisal of exchange properties on which ODF relied was inadequate, (2) ODF failed to obtain an appraisal of mineral rights, and (3) no survey was conducted to fix the boundaries of the Claremont parcel.

■  We turn first to the question of the adequacy of the appraisal of exchange properties. Petitioners argue that, by 2002, the February 1999 appraisal of the exchange properties was too stale to be considered.[19] However, as ODF notes, except for the price of timber, petitioners point to no evidence that any variable affecting the differential value of exchange parcels had changed. ODF further argues that it had reason to believe that a change in timber prices since the February 1999 appraisal would likely work to its relative economic disadvantage because such a reappraisal would likely show that the values of the properties on each side were now roughly equivalent.[20] That could lead G&N to question the need to include any cash equalization payment. Under that scenario, ODF prudently declined to undertake a reappraisal of exchange properties.

Petitioners argue here, as they did before the ALJ, that, although timber prices may have declined over the period during which ODF was considering the land exchange, the amount of timber on the state's contributions would have increased by natural growth disproportionately to the timber growth on private lands during that period, and that increase could have offset the effect of the drop in timber prices. ODF points out, however, that petitioners' argument

---

[19] In an attempt to establish a standard "shelf-life" for timber appraisals, petitioners cite to the practices of some federal agencies and California in requiring an updated timber appraisal after, at most, one year. Petitioners' observation about the practice of other jurisdictions, however, does not speak to the question whether ODF here was required to undertake a reappraisal if ODF had determined that to do so would be to its financial disadvantage in negotiating the exchange's final terms.

[20] As the board noted in its final amended order, citing Lecture's direct testimony to the ALJ, ODF had reasoned that,

"given a substantial drop in timber prices since the appraisal, the value of the property to be contributed to the exchange by the state would probably be significantly reduced. At the same time, there was relatively little marketable timber on the property that the state expected to acquire, so the value of those parcels was unlikely to have dropped as much. Consequently, the amount the state [would have] received from the exchange might well have been significantly reduced."

is refuted by Lecture's testimony that criticized petitioners' "growth forward" calculation as based on an incorrect method and for failing to account for the fact that a number of trees on the parcels to be acquired that were not merchantable in 1999 would have become merchantable by 2002.[21] We conclude that substantial evidence in the record supports ODF's reliance on its February 1999 appraisal of properties.

Petitioners also assert that the February 1999 appraisal failed to "consider the disproportionate burden that the Swiss Needle Cast disease (SNC) would have on the recently harvested G&N parcels as they grow to maturity." In response, ODF points to record evidence refuting the notion that SNC significantly burdens the stands of timber to be acquired. In particular, Lecture testified that, although the disease is present in Clatsop County, the disease is "light" in "the young stands in the central part of the county where the majority of parcels being acquired [by ODF]" are located. The board was entitled to "not consider" the impact of SNC if it credited ODF's judgment that any impact was not significant.

Petitioners also argue that the board erred by not addressing "the failure of the December 1999 appraisal to look at the true value of the timber, by including the possibility of its sale by the trading partners on the foreign market." ODF does not address this point in its respondent's brief. We nevertheless reject the argument because it fails to challenge directly ODF's assessment that declining timber prices had eliminated, at least temporarily, the relatively higher value of all of its parcels *vis-à-vis* G&N's contributions as had been estimated by the *February* 1999 appraisal. ODF's calculation that "the relative value of the state property had declined by more than $262,000—wiping out the proposed monetary compensation that had been agreed as part of the exchange" was relevant to whether ODF could continue to seek an equalization payment from G&N on the basis of the initially identified difference in valuation of the properties. As

---

[21] ODF notes that the board relied, in part, on analyses of timber values undertaken by ODF itself. In reply, petitioners renounce such "statements by a staff member of the ODF," who is an "unqualified individual," as mere "conjecture from a biased official." We note that petitioners' bluster on this point is not effective, uncoupled as it is from serious analysis.

explained above, ODF successfully argued that the initial difference in valuation remained an adequate basis for G&N's equalization payment because, although prices had since dropped, that drop likely was temporary given that the February 1999 prices reflected average prices over a 10-year period. We do not find petitioners' argument convincing.

For the above reasons, then, we reject petitioners' argument that ODF improperly relied on the February 1999 appraisal and on its own subsequent calculations to justify its decision to not seek a reappraisal of exchange properties.

Petitioners' final two arguments in support of this assignment of error are that ODF failed to obtain an appraisal of mineral rights even though those rights constitute a component of the assets to be traded and acquired in the exchange and that, because no survey was conducted to fix the boundaries of the Claremont parcel, critical information was lacking on which the board needed to base its assessment whether the proposed exchange was for equal value.

ODF points out that, "[b]ecause the state already owns the mineral rights on a portion of the G&N lands, the state is exchanging 295 acres of mineral rights for 358.6 acres with similar geological characteristics." Petitioners note that mineral rights are among "the assets associated with ownership of" the properties to be exchanged "that may have significant value and [so] must be considered in an appraisal of the value of the property." Petitioners argue, however, that, "[w]ithout determining actual mineral deposits, the Board has concluded that the exchange is of equal value with respect to the underlying minerals."[22]

Contrary to petitioners' characterization of the issue, however, the board did not conclude that "the exchange is of equal value with respect to the underlying minerals." Instead, the board stated that the mineral rights component

---

[22] Petitioners cite page six of the board's amended final order in support of the assertion that the board "concluded that the exchange is of equal value with respect to the underlying minerals." But no such conclusion is found on that page, and the board's only mention of mineral rights there is the factual statement that "[t]he exchange called for an exchange of deed and mineral rights." As discussed below, the board's amended final order expressly reserved approval of an exchange of mineral and geothermal resource rights, pursuant to statute.

of the land exchange is vested within the jurisdiction of the State Land Board by ORS 273.780, which provides, in part:

> "(1)   Mineral and geothermal resource rights in property owned by any state agency and mineral and geothermal resource rights retained as an interest in lands previously sold, granted or otherwise conveyed by the state or any agency thereof are property of the State of Oregon.
>
> "* * * * *
>
> "(3)   The mineral and geothermal resource rights shall be retained by the state in the absence of a finding by the State Land Board upon adequate facts presented to it that their sale or exchange is for the purpose of obtaining the greatest benefit for the people of this state, consistent with the conservation of lands under its jurisdiction under sound techniques of land management."

Accordingly, mineral rights on the state properties are retained by the state absent a finding by the State Land Board that the exchange of mineral and geothermal resource rights is "for the purpose of obtaining the greatest benefit for the people." Final approval of the mineral rights component of the exchange, then, resides with the State Land Board, not the Board of Forestry.

█   Petitioners argue, however, that the board erred in finding that ORS 273.780 relieves it from its "statutory duty to ensure equal value prior to approving a State forest land trade." ODF responds that, even if the board had been required to consider the value of mineral rights on the properties being exchanged, substantial evidence in the record supports the exchange in mineral rights.

Petitioners rely on an Oregon Department of Geology and Mineral Industries (DOGAMI) letter to support their assertion that "[i]n contrast to the lack of evidence demonstrating exchanged mineral rights are equal, there is plain evidence in the Record that strongly suggests that the mineral interests underlying the State lands have far greater value than the mineral interests in the private lands." Petitioners exaggerate the probative value of the DOGAMI letter. The letter states that several properties in the John Day parcels—part of the state's contribution to the exchange—are "underlain by sandstone that has commercial potential as a

source of feldspar and quartz for glass and ceramic markets." However, that letter also noted that "[s]ampling of the parcel itself and bench scale process testing would be required to determine the suitability of [such] sandstone for commercial development." According to Lecture's testimony, the Division of State Lands decided against such sampling because the mineral deposits are "not in a place where you could develop it very easily without environmental damages." Other than those mineral deposits with constrained development potential, the evidence in the record, including an earlier letter from the author of the cited DOGAMI letter, supports ODF's assertion that the mineral resources potential for all parcels is "equally low." There is substantial evidence in the record to support ODF's position that any difference in mineral value would be too small to undermine the board's conclusion that the exchange is for equal value.

■      Finally, under this assignment of error, petitioners argue that, because no boundary survey was undertaken of the Claremont parcel there is "a potential for a significant discrepancy in value for the exchange because of an existing dispute between the State and Martin Nygaard, one of the G&N partners, who is the owner of the parcel adjacent to the Claremont parcel." However, petitioners point to no evidence in the record that such a dispute exists, and ODF states flatly that there is none. ODF further asserts that "[u]sing an aerial photograph with the lines drawn from the property description [and] using known monuments, the boundary can be found, and hence the amount of timber inside the boundary can be ascertained." The board's findings that the cost of surveying the Claremont Parcel would not be worth the benefit and that it is standard industry practice to exchange forest parcels without property line surveys are supported by substantial evidence in the record.

There is substantial evidence in the record to support ODF's conclusion that the board's approval of the land exchange complied with OAR 629-033-0045(1). We therefore reject petitioners' second assignment of error.

Petitioners, in their third assignment, assert that the board erred in finding that the exchange "furthers the objectives of providing a full range of social, economic and

environmental benefits to the people of Oregon for achieving greatest permanent value as defined in OAR 629-035-0020 as expressed in approved forest management plans." OAR 629-033-0010(2). Petitioners advance three principal arguments in support of this assignment: (1) that the board relied on sources of information, including a biological assessment and a recreational assessment, that failed to demonstrate compliance with the greatest permanent value (GPV) requirement, (2) that the board failed to base its approval of the land exchange on the best science available, and (3) that the board failed to ensure that the exchange was consistent with the relevant forest management plan. Under this assignment, petitioners challenge both the board's interpretation of its obligations under its administrative rules and the board's evaluation of relevant facts. We review the former for errors of law, ORS 183.482(8)(a), and the latter for substantial evidence, ORS 183.482(8)(c).

■        Petitioners first argue that the biological assessment is inadequate to support the board's conclusion that "the proposed sale [*sic*] satisfies the GPV requirement of OAR 629-033-0010," because it is both incomplete and inaccurate. In support of that claim, petitioners cite a subsequent statement by an author of the biological assessment[23] as well as an acknowledgment of data limitations within the biological assessment.

---

[23] Petitioners state that "PWR itself indicated to ODF that, despite cost and feasibility issues, a more rigorous assessment approach is necessary to strengthen the credibility of the assessment process." The actual language of the statement to which petitioners refer is contained in an e-mail dated December 27, 2002—approximately four months after the board approved the exchange—whose purpose was to recommend improvements to ODF's biological assessment program. In the e-mail, Dave Vesely, author of the PWF biological assessment, refers to recommendations in an attached letter, and states:

"We recognize that implementing these recommendations would greatly increase the cost of writing biological assessments. However, it's our opinion that the investment would strengthen the rigor and credibility of the assessment process."

Contrary to petitioners' characterization, Vesely's letter did not assert that "a more rigorous assessment approach is *necessary*." (Emphasis added.) Rather, Vesely stated that implementing certain recommendations, albeit at a greatly increased cost, "would strengthen the rigor and credibility of the assessment process." The difference in meaning is important, if somewhat subtle.

The biological assessment completed by department contractor Pacific Wildlife Research (PWR) indeed acknowledges that its findings "are based on limited information provided to us in the 1999 ODF biological assessment of the G&N/ODF land exchange and brief inspections of each parcel," and that "[t]he information permitted only a relatively coarse-scale habitat assessment for threatened and vulnerable species." Nonetheless, the authors found that their sources of information sufficed to evaluate, for each parcel, the "habitat availability" required by 14 threatened or sensitive fish and wildlife species for cover, feeding, and reproduction.[24] According to biological assessment co-author David Vesely, in addition to the information in ODF's earlier biological assessment, as well as a brief inspection of each parcel by Vesely, data available to the authors included color aerial photographs of the parcels, topographic maps, GIS information for the Clatsop state forest, prior research about relevant species-habitat associations, and the authors' "professional knowledge of wildlife and forests in the Oregon Coast Range." The biological assessment assumed that "the primary cause of land exchange effects on fish and wildlife occurring in and around the candidate parcels" stems from "the difference in management practices between State forests and private forest owners." Based on the available information and that assumption, the authors made findings about whether the amount of habitat required by each species would be increased or decreased by the proposed land exchange.

■ Petitioners argue that the biological assessment fails to consider the impact of the exchange on productive soils, clean air and water, and on efforts to protect against floods and erosion, even though those parameters constitute "two of the four environmental benefits to be considered under the GPV rule." ODF responds that the GPV rule does not define those resources as biological resources, and that the rule specifically requiring an independent biological assessment of a

---

[24] Those species included Winter Steelhead, Oregon Coast Coho, Fall and Summer Chinook, Lower Columbia Cutthroat, Columbia Seep Salamander, Western Toad, Tailed Frog, Marbled Murrelet, Northern Spotted Owl, Pileated Woodpecker, Olive-sided Flycatcher, Willow Flycatcher, Purple Martin, and Fringed Myotis.

land exchange requires only an assessment of plant and wildlife resources. OAR 629-033-0045(2). We conclude that ODF's construction of OAR 629-035-0020 is neither inconsistent with the wording of the rules themselves, their context, nor, as far as the parties inform us, with any other germane source of law. *Don't Waste Oregon Com.,* 320 Or at 142. In particular, nothing in OAR 629-035-0020 requires the biological assessment that is specified in OAR 629-033-0045(2) to evaluate resources beyond plants and wildlife.[25]

Petitioners also question "whether the [biological assessment] prepared by PWR can be considered independent," in light of the fact that ODF reviewed drafts of the biological assessment and suggested some changes in terminology. We have reviewed those portions of the record cited by petitioners in support of that argument and we reject it without further discussion.

Petitioners also depict ODF's instruction to PWR to assume that 63 acres of the Luukinen parcel have been logged and replanted as an unjustifiable "manipulation" of the assessment of impacts on spotted owls. An earlier version of the exchange agreement, as previously noted, indicated that the state timber reservation would be sold at a future timber sale. In the end, however, the timber on that parcel was exchanged, not reserved, and petitioners assert that ODF failed to apprise the board that the assumption in the biological assessment was not correct. Petitioners may be correct that, as a matter of good public policy, ODF should have explained to the board that an unstated assumption in the biological assessment did not hold for the exchange in its final form. However, we disagree with petitioners that the findings of the biological assessment are significantly "tainted" by that retained assumption. In particular, assessment co-author Vesely testified that the fact that the 63 acres of timber had not been logged did not change his overall conclusions about the biological impacts of the exchange, and that he adhered to the assessment that "the short-term loss

---

[25] Moreover, although ODF's rules establish that an exchange is "appropriate" when, among other criteria, it furthers the objective of achieving greatest permanent value, OAR 629-033-0010(2), there is no requirement that every study produced by or for ODF in the land exchange process address every GPV factor.

of existing spotted owl habitat on the Clatsop State Forest resulting from the exchange of the Luukinen parcel was off-set by the acquisition of private lands within spotted owl clusters on state forestlands."[26]

We reject petitioners' argument that the independent biological assessment is too flawed to serve as an adequate source of information for the board's conclusion that the exchange complies with OAR 629-033-0010(2).

■ Petitioners also argue that the recreational assessment was inadequate, given its lack of empirical or quantified data, so that "the Board and ODF arbitrarily concluded that [it] met the requirements of ORS 530.040 and OAR 629-033-0045." ODF argues, however, that "[t]he assessment is merely a tool to assist the board in determining the value of the lands acquired and traded," and that "it is the board, and not the person performing the assessment, which is to determine whether the exchange is consistent with greatest permanent value."

Upon our review of OAR 629-033-0045 and the related rules and statutes, we conclude that the board's construction is consistent with the terms of the rule, its relevant context, and with other sources of law. In particular, nothing in those rules required ODF to contract for or otherwise undertake an empirical study of the comparative usage of the proposed exchange parcels' recreational resources. OAR 629-033-0045 does not require that assessment to come to a conclusion about whether the exchange meets the purposes of OAR 629-033-0010. Rather, that assessment is for the board, which is permitted, but not required, to consider the biological and recreational assessments in coming to that judgment. OAR 629-033-0045(2). While petitioners may be correct in observing that, at one point, Lecture exaggerated in characterizing the recreational assessment as a "state-of-the-art" scientific study, the actual report that ODF supplied to the

---

[26] Vesely's statement is also consistent with ODF's earlier biological assessment that had been undertaken without the assumption that 63 acres of the Luukinen parcel had been logged. That assessment concluded that, although the exchange would result in a short-term loss of 136 acres of habitat potentially suitable for spotted owl foraging, but not for nesting, there would be a long-term gain of 276 acres of spotted owl habitat, as acquired parcels matured.

board provided relevant information about features of the exchange parcels useful in evaluating their relative potential use for recreational activities. The rules require no more.

■    Petitioners argue, as well, that the board failed to consider the "best science available" in determining "whether the proposed land exchange is a management practice that will provide for the greatest permanent value." The board's failure, according to petitioners, is a result of its reliance on the biological assessment as scientific support, "despite the reality that the BA was limited in scope and contained inaccuracies and manipulated assumptions." We have already explained, however, that the biological assessment was adequate for the board's consideration. Petitioners cite OAR 629-035-0020(3)(e) in support of their argument that the biological assessment required under OAR 629-033-0045(2) was inadequate in not assessing all of the best science available. OAR 629-033-0045(2) does not mention the phrase "best science available," although, as previously discussed, it does require ODF to have an independent third party conduct an assessment of plant and wildlife resources of the parcels. OAR 629-035-0020 provides that ODF "shall maintain" and "actively manage" its forest lands in a sound environmental manner, and that its management practices must "[b]e based on the best science available." However, petitioners do not demonstrate how the rule that requires ODF to base its management of forest lands on the best science available applies, in the context of the proposed land exchange, to broaden ODF's obligation under OAR 629-033-0045(2). Accordingly, we adhere to our prior acceptance of ODF's view that the biological assessment required by OAR 629-033-0045(2) needed to evaluate only the proposed exchange's impact on plant and wildlife resources.

Petitioners also argue that gross errors in the biological assessment "taint the scientific credibility of its conclusions." We have reviewed those alleged errors, which were examined extensively in the contested case hearing and were part of the record before the board prior to its final amended order. We do not find those errors to be so "egregious" as to defeat the utility of that assessment to inform the board's relevant determinations, including whether the land exchange

"furthers the objectives of providing a full range of * * * environmental benefits * * * for achieving greatest permanent value * * *." OAR 629-033-0010(2).

Petitioners additionally argue that the board and ODF "failed to consider other reasonably available scientific information." However, the record does not support the contention that the board, in its consideration of the land exchange, either ignored or, as petitioners assert, "dismissed" any information brought to its attention. The board was under no obligation, in issuing its final amended order, to discuss every piece of information that had been submitted to it for consideration. Petitioners also argue that ODF "ignored a watershed analysis completed by the Nehalem Valley Watershed Council" that was "available at no cost" to ODF. But even if that is true, petitioners fail to explain why that undermines the findings and conclusions of the biological assessment that ODF did submit to the board, or why the board's conclusion that the land exchange complies with the relevant rules is thereby "tainted."

Petitioners also challenge the board's finding that the exchange complies with applicable Forest Management Plans. Petitioners note that aspects of the exchange result in some loss of older trees and potentially productive wildlife habitat. But the board correctly states that the goals of Forest Management Plans have a "landscape-level reach," and the board had substantial evidence before it to conclude that ODF"s "consolidation strategy, and the long term benefits of the exchange, which include a substantial net gain in acreage," render the exchange consistent with the Northwest Forest Management Plan.[27]

For the above reasons, we reject petitioners' third assignment of error.

In the fourth assignment, petitioners argue that the board failed to explain why ODF undertook actions that were inconsistent with its prior practices, as required by ORS 183.482(8)(b)(B). First, petitioners argue that, without explanation, ODF conducted "no new appraisal * * * despite the

---

[27] As well, the board concluded that the exchange was consistent with the Astoria Implementation Plan.

passage of three years before the Board finally approved the land exchange," even though, in a different land exchange that had been approved one month earlier, ODF itself requested an updated appraisal. We reject that argument because a single instance does not establish a department practice and because the board adequately explained why ODF chose not to undertake a reappraisal. Petitioners also argue that the board, without explanation, departed from prior practice when it "ignore[d] the impact of the [Swiss Needle Cast] disease on the stands proposed for exchange." We have already concluded that substantial record evidence before the board indicated that the properties to be acquired in the exchange were not significantly impacted by that disease. Petitioners, finally, argue that ODF failed to explain its departure from recent prior practice that considered the comparative value of mineral rights in determining whether a land exchange is for equal value. However, there was substantial evidence to support the view that the value of minerals underlying state lands that may be mined in an environmentally sound manner and then feasibly exploited is no greater than the value of similar deposits on the parcels to be acquired. The board's order specifically reserved approval of the exchange of minerals for decision by the State Land Board. We conclude that the board's approval of the exchange did not contravene ORS 183.482(8)(b)(B) by failing to explain any departure from prior practice and, for that reason, we reject petitioners' fourth assignment of error as well.

Affirmed.