Argued and submitted May 11, 2009, affirmed April 28, petition for review denied
October 21, 2010 (349 Or 173)

TUALATIN RIVERKEEPERS,
an Oregon non-profit corporation;
Willamette Riverkeeper,
an Oregon non-profit corporation;
Columbia Riverkeeper,
an Oregon non-profit corporation;
and Liz Callison,
*Petitioners-Appellants,*

*v.*

OREGON DEPARTMENT OF
ENVIRONMENTAL QUALITY,
an Agency of the State of Oregon;
and Oregon Environmental Quality Commission,
a Commission of the State of Oregon,
*Respondents-Respondents,*

*and*

CLEAN WATER SERVICES,
City of Portland, Port of Portland,
County of Multnomah, County of Clackamas,
Clackamas County Service District Number One,
Surface Water Management Agency of Clackamas County,
City of Gladstone, City of Happy Valley,
City of Lake Oswego, City of Milwaukie,
City of Oregon City, City of River Grove,
City of West Linn, City of Wilsonville,
Oak Lodge Sanitary District, City of Gresham,
and City of Fairview,
*Intervenors-Respondents.*

Multnomah County Circuit Court
060100752; A136050

230 P3d 559

Christopher Winter argued the cause for appellants. With him on the joint briefs were Crag Law Center and Brent Foster.

Erin C. Lagesen, Assistant Attorney General, argued the cause for respondents. With her on the brief were

Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Jay T. Waldron argued the cause for intervenors-respondents. With him on the joint brief were Laura Maffei, Andrew J. Lee and Schwabe, Williamson & Wyatt, P.C.; G. Kevin Kiely, James Kincaid, Carla Scott, and Cable Huston Benedict Haagensen & Lloyd LLP; David Doughman and Beery Elsner & Hammond LLP; and David Ris and Gresham City Attorney's Office.

James J. Nicita filed the brief *amicus curiae* for Northwest Environmental Defense Center, Northwest Environmental Advocates, Native Fish Society, Friends of the Clackamas River, and Barbara Kemper.

Before Wollheim, Presiding Judge, and Brewer, Chief Judge, and Sercombe, Judge.*

SERCOMBE, J.

_____

* Brewer, C. J., *vice* Edmonds, P. J.

## SERCOMBE, J.

Petitioners sought judicial review of several municipal storm water permits issued by respondent[1] pursuant to ORS 468B.050 and the federal Clean Water Act, *see* 33 USC § 1342.[2] They appeal following the trial court's grant of summary judgment in favor of respondent, contending that, in issuing the permits, respondent acted inconsistently with the requirements of ORS 468B.025(1)(b) and OAR 340-045-0015(5)(c), as well as ORS 468B.050 and OAR 340-042-0080. We affirm.

The storm water permits at issue are all National Pollutant Discharge Elimination System (NPDES) permits, issued by respondent as part of the state's implementation of the Clean Water Act. *See* ORS 468B.035 (EQC "may perform or cause to be performed any acts necessary to be performed by the state to implement" the provisions of the Clean Water Act). Although municipal storm water was not initially regulated pursuant to the NPDES program,[3] eventually, the Clean Water Act was amended to explicitly require regulation of certain storm water discharges. *See American Min. Congress v. U.S.E.P.A.*, 965 F2d 759, 763 (9th Cir 1992) (discussing amendments to Clean Water Act requiring that regulation). After those amendments but prior to 1994, most discharges composed entirely of storm water did not require an NPDES permit. 33 USC § 1342(p)(1). However, discharges from municipal separate storm sewer systems[4] serving populations of more than 100,000 people were subject to a permit

---

[1] For ease of reference, we refer to Oregon Department of Environmental Quality (DEQ) and Oregon Environmental Quality Commission (EQC), collectively, as "respondent."

[2] The Federal Water Pollution Control Act, 33 USC §§ 1251 - 1376, is generally referred to as the Clean Water Act. National Pollutant Discharge Elimination System permits are issued pursuant to the Clean Water Act. They are specifically provided for in 33 USC section 1342.

[3] For example, 40 CFR section 125.4(f) (1975) provided that, generally, no NPDES permit was required for "uncontrolled discharges composed entirely of storm runoff when these discharges are uncontaminated by any industrial or commercial activity[.]"

[4] A municipal separate storm sewer is

"a conveyance or system of conveyances including roads with drainage systems, municipal streets, catch basins, curbs, gutter[s], ditches, manmade channels, or storm drains that is owned or operated by a state, city, county, district, association, or other public body; is designed or used for collecting or

requirement. 33 USC § 1342(p)(2)(C) - (D). The permit requirement now applies to an even larger range of municipal storm water dischargers: OAR 340-045-0015(2) provides that, "[w]ithout first obtaining an NPDES permit, a person may not discharge into navigable waters * * * storm water subject to permit requirements in 40 CFR § 122.26 or § 122.33, including storm water from large, medium, and regulated small municipal separate storm sewer systems[.]"

The NPDES permits at issue in this case were issued by respondent and authorize the municipal permittees, who are intervenors in this judicial review proceeding, to

"implement a storm water management program to reduce the contribution of pollutants in storm water to the maximum extent practicable (MEP), to address where applicable TMDL [total maximum daily load] wasteload allocations, and to discharge storm water to waters of the State, in conformance with all the requirements and conditions set forth in the attached schedules * * *."[5]

The permits mandate that the permittees "implement all applicable provisions in the Storm Water Management Plan (SWMP) as the associated Monitoring Program" and incorporate the SWMP by reference.

"The SWMP and associated Monitoring Program include best management practices (BMPs), monitoring triggers, narrative conditions, adaptive management and other elements designed to reduce the introduction of pollutions into the waters of the State from [municipal separate storm sewer systems] to the maximum extent practicable (MEP). The SWMP also includes evaluation and reporting requirements designed to measure the effectiveness of BMPs and other programs."

conveying storm water; and is not a combined sewer or part of a Publicly Owned Treatment Works as defined in 40 CFR § 122.2."

OAR 340-045-0010(10); *see also* OAR 340-045-0010(11) (" 'Municipal Separate Storm Sewer System or MS4' means all municipal separate storm sewers that are defined as 'large,' 'medium,' or 'small' municipal separate storm sewers systems in 40 CFR § 122.26(b).").

[5] The permit issued to Clean Water Services contains slightly different language.

Pursuant to those permits, the municipal permittees discharge storm water into a number of rivers and streams, including the Columbia, Willamette, and Tualatin Rivers.

Although the permits are extensive, it is undisputed that that they do not contain conditions stating that the storm water discharges must comply with state water quality standards. In addition, the permits do not specify wasteload allocations[6] in the form of numeric effluent limits; they instead incorporate benchmarks. They also require compliance with the SWMP, which, in turn, incorporates best management practices. It is the permits' lack of numeric limits and conditions requiring compliance with state water quality standards that gave rise to this case.

On summary judgment, the trial court concluded that "the agency did not erroneously interpret a provision of law in issuing the final orders before the Court, that the agency's exercise of discretion was not inconsistent with an agency rule, and the agency's discretion was not outside the range of discretion delegated to the agency by law[.]" Accordingly, it entered a general judgment affirming the permits and dismissing the judicial review proceeding with prejudice. Petitioners seek review of that dismissal.

ORS 183.484(5) provides the criteria for judicial review of orders in other than contested cases:[7]

"(a)  The court may affirm, reverse or remand the order. If the court finds that the agency has erroneously interpreted a provision of law and that a correct interpretation compels a particular action, it shall:

"(A)  Set aside or modify the order; or

"(B)  Remand the case to the agency for further action under a correct interpretation of the provision of law.

---

[6] "Wasteload Allocation" refers to the portion of receiving water's loading capacity that is allocated to a particular source of pollution. *See* OAR 340-042-0040(4)(g) (a wasteload allocation "determines the portions of the receiving water's loading capacity that are allocated to existing point sources of pollution, including all point source discharges regulated under the Federal Water Pollution Control Act Section 402 (33 USC Section 1342)" (emphasis omitted)); OAR 340-041-0002(67) (defining wasteload allocation).

[7] The storm water permits at issue are orders in other than a contested case. *See Wilbur Residents v. DEQ*, 176 Or App 353, 354, 30 P3d 1228, *rev den*, 333 Or 73 (2001).

"(b)   The court shall remand the order to the agency if it finds the agency's exercise of discretion to be:

"(A)   Outside the range of discretion delegated to the agency by law;

"(B)   Inconsistent with an agency rule, an officially stated agency position, or a prior agency practice, if the inconsistency is not explained by the agency; or

"(C)   Otherwise in violation of a constitutional or statutory provision.

"(c)   The court shall set aside or remand the order if it finds that the order is not supported by substantial evidence in the record. Substantial evidence exists to support a finding of fact when the record, viewed as a whole, would permit a reasonable person to make that finding."

We review the trial court's judgment to determine whether it correctly assessed respondent's actions under the standards set forth in ORS 183.484(5). *See G.A.S.P. v. Environmental Quality Commission*, 198 Or App 182, 187, 108 P3d 95, *rev den*, 339 Or 230 (2005) (we review to determine compliance with the standards set forth in ORS 183.484(5)). The issues presented in this case are purely legal in nature. Thus, we review to determine whether, in issuing the permits, respondent "erroneously interpreted a provision of law" and whether respondent exercised its discretion "outside the range of discretion delegated" by law, or acted "inconsistent[ly] with an agency rule" or "otherwise in violation of * * * a statutory provision." ORS 183.484(5). Specifically, we examine the requirements of the statutory and regulatory provisions that petitioners contend respondent violated in issuing the permits.

■   In their first assignment of error, petitioners assert that, because the permits "do not ensure that the [allowed] discharges will comply with and protect Water Quality Standards," respondent's issuance of those permits violated the requirements of ORS 468B.025(1)(b) and OAR 340-045-0015(5)(c).[8] In essence, petitioners contend that, in light of

---

[8] Petitioners do not contend that the municipal storm water permits violate the requirements of federal law. In *Defenders of Wildlife v. Browner*, 191 F3d 1159, 1163 (9th Cir 1999), the court explained the background of the regulation of municipal storm water and explained the requirements of federal law with respect to such storm water and state water quality standards. The court held that permits

ORS 468B.025, respondent was required to impose stricter permit requirements on municipal storm water discharges than are required pursuant to the federal scheme. We look first at the statute, which we construe by examining its text, context, and any legislative history submitted by the parties, giving the legislative history the weight, if any, that we conclude it merits. *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009).

ORS 468B.025 provides:

"(1)   Except as provided in ORS 468B.050 or 468B.053, no person shall:

"(a)   Cause pollution of any waters of the state or place or cause to be placed any wastes in a location where such wastes are likely to escape or be carried into the waters of the state by any means.

"(b)   Discharge any wastes into the waters of the state if the discharge reduces the quality of such waters below the water quality standards established by rule for such waters by the Environmental Quality Commission.

"(2)   No person shall violate the conditions of any waste discharge permit issued under ORS 468B.050.

"(3)   Violation of subsection (1) or (2) of this section is a public nuisance."

ORS 468B.050, in turn, authorizes DEQ to issue permits and sets out circumstances in which a permit is required. *See also EQC v. City of Coos Bay*, 171 Or App 106, 110, 14 P3d 649 (2000) ("ORS 468B.050(1)(a) specifies when it is necessary to obtain a permit[.]").

On its face, ORS 468B.025 does not set forth standards for the issuance of permits or describe what conditions a permit must contain. Instead, it lists several activities that

---

providing for discharges of municipal storm water need not require strict compliance with state water quality standards under the federal law. Although the Environmental Protection Agency (EPA) has discretion to require such compliance as it determines appropriate, the federal statutory scheme requires only that municipal storm water dischargers " 'reduce the discharge of pollutants to the maximum extent practicable, including management practices, control techniques and systems, design and engineering methods, and other such provisions as the Administrator * * * determines appropriate for the control of such pollutants.' " *Id.* at 1165 (quoting 33 USC § 1342(p)(3)(B)(iii) (omission in original)).

"no person shall" engage in. Those are (1) violating the conditions of a permit issued pursuant to ORS 468B.050; (2) except as provided in ORS 468B.050 or 468B.053, causing pollution of the waters of the state, or causing waste to be placed in a location where it is likely to enter the waters of the state; and (3) except as provided in ORS 468B.050 or 468B.053, discharging waste into the waters of the state if the discharge reduces the quality of those waters below state water quality standards. None of those provisions directly governs DEQ's issuance of permits.

Furthermore, pursuant to the plain text of the statute at issue, in context, the prohibition on discharges that reduce the receiving water below state water quality standards is not absolute. On the contrary, as noted, ORS 468B.025(1)(b) specifically refers to the permit section of the statute, providing that, "[e]*xcept as provided in ORS 468B.050 or 468B.053*," persons may not discharge waste into the water if those discharges reduce the water quality below applicable state water quality standards. (Emphasis added.) Under ORS 468B.050, DEQ is authorized to issue a permit allowing the discharge of wastes into the waters of the state. Alternatively, under ORS 468B.053, EQC may exempt *de minimis* discharges (and other specified discharges not relevant here) from the permits "required under ORS 468B.025 or 468B.050[.]"[9] Read together, the statutes prohibit any person from discharging wastes into the waters of the state if those discharges would reduce the quality of that water below the state's water quality standards *unless* the person has a permit from DEQ specifically authorizing the discharge at issue. Neither statute requires that permits issued must contain provisions mandating compliance with water quality standards.[10] Instead of placing that type of limitation on respondent's ability to determine and impose

_____

[9] Specifically, pursuant to ORS 468B.053(2), EQC may exempt "from permit requirements subsurface injection of fluids that are authorized under the underground injection control program of" DEQ. Also, ORS 468B.050 references ORS 468B.215, pursuant to which, "[e]xcept for an animal feeding operation subject to regulation under 33 USC 1342, a fee shall not be assessed to nor permit required under ORS 468B.050(1)(d) of confined animal feeding operations of four months or less duration or that do not have waste water control facilities."

[10] Federal law generally requires that discharges pursuant to NPDES permits must strictly comply with state water quality standards. 33 USC § 1311(b)(1)(C);

appropriate permit conditions, the statutes generally give respondent discretion in those areas. Indeed, the only express requirement included in ORS 468B.050 as to the issuance of permits thereunder is that such permits "shall specify applicable effluent limitations."

Petitioners, citing ORS 468B.030, suggest that an effluent limitation, by definition, must mandate compliance with state water quality standards. That is not the case. ORS 468B.030 provides, in relevant part:

> "In relation to waters of the state, the [EQC] by rule may establish effluent limitations, as defined in [the Clean Water Act], and other minimum requirements for disposal of wastes, minimum requirements for operation and maintenance of disposal systems, and all other matters pertaining to standards of quality for the waters of the state."

The Clean Water Act, in turn, defines "effluent limitation" as "*any* restriction established by a State or the Administrator on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into navigable waters, the waters of the contiguous zone, or the ocean, including schedules of compliance." 33 USC § 1362(11) (emphasis added).[11] Thus, although a permit must include restrictions on discharges of pollutants into the water, the applicable statute does not specify what form they must take. "Best management practices," such as those incorporated in the permits at issue in this case, are a type of effluent limitation. *See* 40 CFR § 122.44(k)(2) - (3) (best management practices are to be used in NPDES permits where authorized pursuant to 33 USC § 1342(p) for the control of storm water discharges or where numeric effluent limits are infeasible); *see also Interim Permitting Approach for Water Quality-Based Effluent Limitations in Storm Water*

---

*see Defenders of Wildlife*, 191 F3d at 1163. However, under 33 USC § 1342(p)(3)(B), dischargers of municipal storm water are not subject to that requirement. *See Defenders of Wildlife*, 191 F3d at 1165-66. Instead, federal law requires that NPDES permits relating to municipal storm water discharges require reduction of "the discharge of pollutants to the maximum extent practicable." 33 USC § 1342(p)(3)(B)(iii); *see Defenders of Wildlife*, 191 F3d at 1165 ("§ 1342(p)(3)(B)(iii) creates a lesser standard than § 1311").

[11] Effluent limitations can be water-quality based, *see, e.g.*, OAR 340-041-0002(67) (a WLA is a water-quality-based effluent limitation) or technology based, *see, e.g.*, 40 CFR § 125.3 (discussing technology-based effluent limitations).

*Permits*, 61 Fed Reg 43,761-01 (Aug 26, 1996) (EPA considers the use of best management practices appropriate in permitting of municipal storm water based on typical lack of information on which to base numeric water quality-based effluent limitations). In short, petitioners incorrectly equate effluent limitations with state water quality standards. A statutory requirement that storm water permits include effluent limitations is not the same as a requirement that the permits mandate compliance with state water quality standards.

Petitioners urge that the context of the statute supports their assertion that ORS 468B.025(1)(b) should be read to require the inclusion of specific terms mandating compliance with state water quality standards in any permit issued by respondent.[12] We disagree. In fact, our review of the statutory context confirms our determination that, rather than imposing that specific limitation on respondent's authority to issue the type of permits at issue, the legislature delegated broad discretion to the agency. ORS 468B.015 sets forth the policies of the state to (1) conserve the waters of the state, (2) protect and improve water quality, (3) provide for treatment or other corrective action before waste is discharged into the water, (4) prevent and control pollution, and (5) cooperate with other agencies, states, and the federal government.[13] In order to carry out that policy, the legislature granted broad authority to respondent:

"(2)   In order to carry out the public policy set forth in ORS 468B.015, [DEQ] shall take such action as is necessary for the prevention of new pollution and the abatement of existing pollution by:

---

[12] Petitioners also point to our decision in *EQC v. City of Coos Bay*, 171 Or App 106, 14 P3d 649 (2000), in support of their first assignment of error. However, that case does not inform our decision here. There, we considered whether ORS 468B.025 and ORS 468B.050 authorized EQC to impose penalties on a permittee that violated the terms of its permit and concluded that only ORS 468B.025 prohibited violations of permit conditions. We did not address the question whether ORS 468B.025 required particular conditions mandating compliance with water quality standards to be included in NPDES permits issued by DEQ.

[13] ORS 468B.015 was amended in 2009. Or Laws 2009, ch 248, § 1. That amendment does not significantly modify the statute's language and, in any event, is not relevant to this case.

> "(a) Fostering and encouraging the cooperation of the people, industry, cities and counties, in order to prevent, control and reduce pollution of waters of the state; and
>
> "(b) Requiring the use of *all available and reasonable methods necessary* to achieve the purposes of ORS 468B.015 and to conform to the standards of water quality and purity established under ORS 468B.048."

ORS 468B.020 (emphasis added); *see also Springfield Education Assn. v. School Dist.*, 290 Or 217, 228, 621 P2d 547 (1980) (Terms such as "unreasonable" or "public convenience and necessity" are delegative in nature and give an agency "authority, responsibility and discretion for refining and executing generally expressed legislative policy."); ORS 468B.048 (authorizing the agency to "establish standards of quality and purity for waters of this state"); ORS 468.065(1) (providing that all permits shall be "in a form prescribed by" the agency and shall "specify its duration, and the conditions for compliance with the rules and standards, if any, adopted by the [EQC] pursuant to * * * ORS chapters 468 * * * and 468B"). Those statutes, taken together, make clear that, instead of including many specific requirements regarding the issuance of permits, the legislature intended to delegate the responsibility for appropriately implementing its policies to the agency. That context, in turn, supports our conclusion that the plain text of ORS 468B.025(1)(b) does not require respondent to include in its storm water permits specific conditions mandating compliance with state water quality standards.[14] In light of the foregoing, we conclude that respondent's issuance of the permits in this case did not violate ORS 468B.025(1)(b).[15]

Petitioners next assert that the permits are inconsistent with the requirements of OAR 340-045-0015(5)(c).

---

[14] We note that we have considered the legislative history submitted by petitioners but did not find it helpful in resolving the issue presented.

[15] We further note, parenthetically, that petitioners' argument, if extended to ORS 468B.025(1)(a), would lead to an absurd result. That section of the statute prohibits any person from, among other things, causing "pollution of any waters of the state" except as provided by ORS 468B.050 or ORS 468B.053. As noted, ORS 468B.050, in turn, provides for the issuance of permits. Under petitioners' reasoning, however, the issuance of permits that would allow for pollution of waters of the state would be impermissible. As a result, NPDES permits, which allow for pollution by their terms, could never be issued.

According to petitioners, that rule creates "a distinct and specific regulatory requirement that permits for municipal stormwater discharges comply with Water Quality Standards." We are not persuaded.

■ ■ "Administrative rules are interpreted under the same analytical framework we apply when construing statutes." *Birmingham v. Department of Forestry*, 209 Or App 736, 743-44, 149 P3d 600 (2006), *rev den*, 342 Or 644 (2007). We defer to an agency's interpretation of its own rule if that interpretation is plausible and not inconsistent with the text of the rule, its context, or some other source of law. *Don't Waste Oregon Com. v. Energy Facility Siting*, 320 Or 132, 142, 881 P2d 119 (1994).

Pursuant to OAR 340-045-0015(5):

"Each person required by sections (1) and (2) of this rule to obtain a permit must:

"(a)   Promptly apply to the Department for the permit;

"(b)   Fulfill all terms and conditions of the permit issued;

"(c)   Comply with applicable federal and state requirements, effluent standards, and limitations including but not limited to those contained in or promulgated pursuant to Sections 204, 301, 302, 304, 306, 307, 402, and 403 of the [Clean Water Act] and applicable federal and state water quality standards[.]"

The permittees in this case are required to obtain permits pursuant to OAR 340-045-0015(2), which provides:

"Without first obtaining an NPDES permit, a person may not discharge into navigable waters pollutants from a point source or storm water subject to permit requirements in 40 CFR § 122.26 or § 122.33, including storm water from large, medium, and regulated small municipal separate storm sewer systems and storm water associated with industrial or construction activity."

Like ORS 468B.025, the text of OAR 340-045-0015(5), does not, by its terms, regulate the issuance of permits by the agency. Instead, it requires persons who must obtain permits pursuant to sections (1) and (2) of the rule to do certain things. Namely, those persons must apply for the

required permit promptly, fulfill the terms and conditions of the permit, and comply with applicable federal and state requirements and standards. On its face, the rule says nothing about what must be included in a permit, nor does it impose particular conditions on the issuance of permits. In contrast, other rules do impose requirements on respondent with respect to the issuance of permits. *See, e.g.*, OAR 340-045-0027 (public notice and participation requirements for permitting actions); OAR 340-045-0033 (requirements for general permits). Indeed, OAR 340-045-0035, which governs the issuance of the type of permit at issue in this case, imposes specific requirements on respondent.

Furthermore, OAR 340-045-0015(5) does not itself make state water quality standards applicable to storm water dischargers. Instead, it simply requires compliance with "applicable" federal and state water quality standards. The text of the provision, thus, only requires that permittees comply with legal standards that some other source makes applicable to them. As we have observed, pursuant to federal and state statutes, permits for the discharge of municipal storm water, unlike other NPDES permits, need not incorporate provisions requiring compliance with state water quality standards. In the context of storm water, permittees must implement best management practices to reduce the discharge of pollutants in storm water to the maximum extent practicable. OAR 340-045-0015(5) does not impose a stricter requirement. Instead, it simply requires that, to the extent that state water quality standards otherwise apply, a permittee must comply with them. Because those standards are not otherwise strictly applicable to storm water, the rule does not, itself, make them applicable. In sum, we are not persuaded by petitioners' assertion that, because they do not contain specific conditions requiring compliance with instream state water quality standards, the permits violate the requirements of OAR 340-045-0015(5).

In their second assignment of error, petitioners argue that respondent acted inconsistently with ORS 468B.050 and OAR 340-042-0080 when it issued the permits "because the [p]ermits do not incorporate wasteload allocations as enforceable effluent limitations." Petitioners' argument suggests that wasteload allocations should be set forth

as numeric limits within the permits and that the benchmarks incorporated into the permits are impermissible.

In their argument regarding the statute, petitioners suggest that the permits are inconsistent with the requirements of ORS 468B.050 and point to that statute's general requirement that permits "shall specify applicable effluent limitations." As discussed above, that statute does not mandate that such effluent limitations take a particular form. A best management practices requirement is a type of effluent limitation. In this case, the permits included such a limitation (set forth in detail in the incorporated storm water management plans). We reject petitioners' assertion that the permits violate ORS 468B.050.

■    We turn to petitioners' assertion that the permits violate OAR 340-042-0080. That rule is part of a set of rules adopted by respondent relating to "total maximum daily loads (TMDLs)." A TMDL is

> "a written quantitative plan and analysis for attaining and maintaining water quality standards and includes the elements described in OAR 340-042-0040. These elements include a calculation of the maximum amount of a pollutant that a waterbody can receive and still meet state water quality standards, allocations of portions of that amount to the pollutant sources or sectors, and a Water Quality Management Plan to achieve water quality standards."

OAR 340-042-0030(15). TMDLs are established for pollutants in waters of the state that are identified, pursuant to 33 USC section 1313(d), as being water quality impaired. OAR 340-042-0040(1); *see* 33 USC § 1313(d). Among other things TMDLs must include loading capacities (the amount of a pollutant that a waterbody can receive and still meet water quality standards), wasteload allocations (the portions of the receiving water's loading capacity allocated to particular point sources), and a water quality management plan (a framework of management strategies to attain and maintain water quality standards, including proposed strategies to meet wasteload allocations in the TMDL). OAR 340-042-0040(4).

As part of the implementation of TMDLs, "[f]or sources subject to permit requirements in ORS 468B.050,

wasteload allocations and other management strategies will be incorporated into permit requirements." OAR 340-042-0080(4). In relation to TMDLs, the term "wasteload allocation" is defined, by rule, to mean "the portion of [the] receiving water's loading capacity that is allocated to one of its existing or future point sources of pollution. [Wasteload allocations] constitute a type of water quality-based effluent limitation." OAR 340-041-0002(67). However, the rule does not specifically provide the manner in which those wasteload allocations must be implemented. Petitioners' argument raises the question whether wasteload allocations have been incorporated into the permits in a meaningful way. We conclude that they have.

The applicable TMDLs in this case set forth specific wasteload allocations for municipal storm water. The permits at issue, in turn, indicate the bodies of water for which TMDLs and wasteload allocations have been established and reference the specific TMDL for those bodies of water. The permits provide in the "adaptive management" section that, "[w]here TMDL wasteload allocations have been established for pollutant parameters associated with the permittee's [municipal separate storm sewer system] discharges, the permittee must use the estimated pollutant load reductions (benchmarks) established in the [storm water management plan] to guide the adaptive management process." Furthermore, they include a section that specifically addresses the TMDL wasteload allocations. The section is intended to "ensure pollutant discharges for those parameters listed in the TMDL are reduced to the [maximum extent practicable]. Adequate progress toward achieving assigned wasteload allocations * * * will be demonstrated through the implementation of best management practices that are targeted at TMDL-related pollutants." Pursuant to that section, permittees must evaluate progress toward reducing pollutant loads "through the use of performance measures and pollutant load reduction benchmarks developed and listed in the [storm water management plan]."[16] The storm water management

---

[16] A benchmark is defined in the permit as

"a total pollutant load reduction estimate for each parameter or surrogate, where applicable, for which a [wasteload allocation] is established at the time of permit issuance. A benchmark is used to measure the overall effectiveness of

plan describes a program, including best management practices, designed to achieve reductions in TMDL pollutants. Failure to meet an approved benchmark is not, itself, a violation of permit conditions. However, such a failure gives rise to an obligation on the part of the permittee to follow the adaptive management process to improve the storm water management plan. Failure to engage in that process would be a violation of the permits.

In our view, the provisions of the permits are sufficient to meet the requirement of OAR 340-042-0080(4) that wasteload allocations be incorporated into permit requirements. The agency has interpreted what it means to "incorporate" wasteload allocations through its implementation of that rule in the issuance of permits, and that interpretation is a reasonable one. Although the permits do not themselves include numeric wasteload allocations like those set forth in the TMDLs, the TMDL wasteload allocations are clearly referenced in the permits, and the permits require implementation of best management practices, set forth in the storm water management plans, to make progress toward meeting those wasteload allocations. Again, best management practices are a type of effluent limitation that is used in municipal storm water permits. *See* 40 CFR § 122.44(k)(2) - (13). Furthermore, the permits incorporate benchmarks, through incorporation of the storm water management plan, which are specific pollutant load reduction goals for the permittees. Those measures are "permit requirements" that properly incorporate the TMDL wasteload allocations.

As well, contrary to petitioners' assertion, the permits incorporate wasteload allocations in a way that is enforceable. Although the failure to reduce pollutants to the extent set forth in a particular benchmark is not itself a violation of the permit, it gives rise to specific obligations on the part of the permittee. Furthermore, the requirement that permittees implement best management practices that are set out in their approved storm water management plan is an enforceable requirement. Looking at the permits in light of

---

the storm water management plan in making progress toward the wasteload allocation * * * and is intended to be a tool for guiding the adaptive management activities."

the requirements of the regulatory scheme, we conclude that their provisions are sufficient to meet the requirement of OAR 340-042-0080 that "wasteload allocations * * * be incorporated into permit requirements."

In light of the foregoing discussion, we conclude that the permits do not violate ORS 468B.025, ORS 468B.050, OAR 340-045-0015, or OAR 340-042-0080. Accordingly, the trial court did not err in granting summary judgment in favor of respondent.

Affirmed.