No. 866       October 8, 2025       11

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

PACIFICORP,
*Petitioner-Respondent,*

*v.*

OREGON DEPARTMENT OF
ENVIRONMENTAL QUALITY,
*Respondent-Appellant.*

Marion County Circuit Court
20CV12262; A179035

J. Channing Bennett, Judge.

Argued and submitted December 4, 2023.

Carson L. Whitehead, Assistant Attorney General, argued the cause for appellant. Also on the briefs were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Michael R. Campbell argued the cause for respondent. Also on the brief were Crystal S. Chase and Stoel Rives, LLP.

Before Ortega, Presiding Judge, and Lagesen, Chief Judge, and Powers, Judge.

ORTEGA, P. J.

Affirmed.

**ORTEGA, P. J.**

In this "other than contested case," ORS 183.484, the Oregon Department of Environmental Quality (ODEQ) appeals from a circuit court judgment that remanded a final order that set a total maximum daily load (TMDL) for temperature discharged to the waterbodies in the Upper Klamath and Lost River Subbasins, which are part of the Klamath River basin.[1] Both subbasins straddle the Oregon-California border and the Klamath River flows from Oregon into California. As relevant here, in the TMDL, ODEQ applied the California water quality standard for temperature at the Oregon-California border, which is a more stringent standard than Oregon's water quality standard. Petitioner challenged the TMDL, arguing that ODEQ lacked legal authority to apply the California standard. On cross-motions for summary judgment, the circuit court agreed with petitioner and remanded the order to ODEQ for further consideration.

We conclude that ODEQ adopted an implausible construction of OAR 340-042-0040(4)(c) when it determined that "the relevant water quality standards" in that rule could include California's water quality standards that have not been adopted in Oregon as an Oregon standard. Based on the context of the TMDL rules, and particularly the rules describing the purpose of a TMDL, we conclude that "the relevant water quality standards" refer to relevant Oregon water quality standards. Accordingly, we affirm.

## I.  BACKGROUND

### A.  *Overview of Regulatory Framework*

Under the federal Clean Water Act, states are required to establish a TMDL for a pollutant for any waterbody that the state has identified as not meeting the applicable water quality standards for the waterbody. *See* 33 USC § 1313(d)(1). Specifically, that statute provides, in relevant part:

"(A)   Each State shall identify those waters within its boundaries for which the effluent limitations required by

---

[1] In a companion case, also decided this date, *Horsefly Irrigation District v. DEQ*, 344 Or App 23, ___ P3d ___ (2025), we address a different issue in a challenge to the same TMDL issued by ODEQ.

section 1311(b)(1)(A) and section 1311(b)(1)(B) of this title are not stringent enough to implement any water quality standard applicable to such waters. ***

"*****

"(C)   Each State shall establish for the waters identified in paragraph (1)(A) of this subsection, ***, the total maximum daily load, ***. Such load shall be established at a level necessary to implement the applicable water quality standards ***."

33 USC § 1313(d)(1). In short, "a TMDL is the maximum amount of a pollutant allowed to enter a waterbody so that the waterbody will meet and continue to meet water quality standards for that pollutant." *Hayes Oyster Co. v. DEQ*, 316 Or App 186, 188, 504 P3d 15 (2021), *rev den*, 369 Or 507 (2022); *see also* OAR 340-042-0030(15) (defining TMDL).[2] Oregon must submit TMDLs to the federal Environmental Protection Agency for approval. 33 USC § 1313(d)(2).

        The rules governing TMDLs are in OAR chapter 340, division 042.[3] The rule stating the "Policy, Purpose and Effect," provides, in part, "[t]hese rules establish procedures for developing, issuing and implementing TMDLs as required by the [federal Clean Water Act] and authorized by Oregon statutes to ensure that state water quality standards are met and beneficial uses protected." OAR 340-042-0025(3). In establishing a TMDL, ODEQ is required to include certain elements, which are specified in OAR 340-042-0040(4). As relevant here, under OAR 340-042-0040(4)(c), a TMDL must include "[w]ater quality standards and beneficial uses." As provided in that rule, "[t]his element identifies

_____

[2] A TMDL is defined in Oregon as

"a written quantitative plan and analysis for attaining and maintaining water quality standards and includes the elements described in OAR 340-042-0040. These elements include a daily load calculation of the maximum amount of a pollutant that a waterbody can receive and still meet state water quality standards, allocations of portions of that amount to the pollutant sources or sectors, and a Water Quality Management Plan to achieve water quality standards."

OAR 340-042-0030(15).

[3] The TMDL at issue here was established in 2019. Several of the applicable rules in OAR chapter 340, division 042 were amended in 2022. However, those amendments did not make substantive changes to the rules at issue here and do not affect our analysis. As a result, we cite to the current version of the rules in this opinion.

the beneficial uses in the basin and the relevant water quality standards, including specific basin standards * * *." Those water quality standards are used to determine the TMDL element of "loading capacity," which "specifies the amount of a pollutant or pollutants that a waterbody can receive and still meet water quality standards." OAR 340-042-0040(4)(d). The water quality management plan (WQMP) of a TMDL "provides the framework of management strategies to attain and maintain water quality standards." OAR 340-042-0040(4)(l).

B.   *The Temperature TMDL Order*

In September 2019, ODEQ issued the Upper Klamath and Lost River Subbasins Temperature TMDL and Water Quality Management Plan (Temperature TMDL).[4] As described in the Temperature TMDL:

> "Klamath River basin (Figure 1-1) is 12,680 square miles originating in southern Oregon extending through northern California to the Pacific Ocean * * *. Forty-four percent of the watershed lies within Oregon while the remaining 56 percent lies within California. This document presents Total Maximum Daily Loads (TMDLs) for temperature in the Oregon portion of the Upper Klamath * * * and the Lost [River] subbasins * * *."

Among the waterbodies included in the TMDL are the Oregon portions of the Klamath River and the Oregon portions of Spring, Fall, and Jenny Creeks.

The identified water quality standards in the Temperature TMDL include several standards in OAR chapter 340, division 041, as well as "California's downstream water quality standards."[5] The TMDL states that "[i]t is the policy of Oregon DEQ to achieve water quality standards established by neighboring states in interstate waters." In the sections titled "State of California Water Quality Standards," ODEQ worked with the North Coast Regional Water Quality Control Board and obtained memos from that board explaining California water quality targets to protect fish for the

---

[4] In the Temperature TMDL, ODEQ sometimes refers to the applicable subbasin as "Lost" and sometimes as "Lost River." For consistency, we refer to the subbasin throughout as "Lost River."

[5] Specifically, the TMDL identifies the following Oregon water quality standards: OAR 340-041-0028(4)(e), (5), (9)(a), (11), (12)(b), and ORS 340-041-0185(2).

Klamath River, Jenny Creek, Lost River subbasin tributaries, and Lost River. With regard to the California standards, the Temperature TMDL set allocations to meet California water quality targets at the Oregon-California border. It is undisputed that the California water quality standards for temperature are more restrictive than Oregon standards.

C.   *Proceedings Below*

Petitioner owns and operates the Klamath Hydroelectric Project on the Klamath River and its tributaries in Oregon and California. Petitioner's facilities in Oregon include small hydroelectric generating facilities on each side of the Klamath River downstream of Upper Klamath Lake, the Keno Dam, the J.C. Boyle Dam, and the Spring Creek Diversion, which diverts water for power generation at a facility in California. The Temperature TMDL identifies petitioner as having responsibility for developing source-specific implementation plans to address load allocations for the J.C. Boyle Dam and the Keno Dam.

Petitioner brought a petition for review in the circuit court challenging ODEQ's Temperature TMDL, asserting several claims. As relevant here, petitioner alleged in Count 4 that ODEQ was without legal authority to set the TMDL at a level to implement California's more stringent water quality standard for temperature at the Oregon-California border. ODEQ moved for summary judgment on Count 4, arguing that it acted within its broad authority to achieve the purposes of the state and federal laws and that it has authority to work with other states in doing so. Petitioner cross-moved for summary judgment, arguing that, under the federal Clean Water Act and Oregon regulations, ODEQ could only apply those water quality standards applicable to the waters within Oregon's boundaries—that is, the water quality standards established by Oregon.

The circuit court granted summary judgment to petitioner on Count 4 and remanded the Temperature TMDL back to ODEQ. Based on the court's prior experience with litigation involving the Klamath basin system, the court took "notice that the Executive Branch, including [O]DEQ has a huge volume of data and scientific research

upon which it can rely in making determinations in its exercise of discretion." The court concluded that "[a] plain reading of the [Clean Water Act] and Oregon's water laws suggests an evidence/data based approach to setting the appropriate standards." The court further concluded that ODEQ "simply and arbitrarily adopted the TMDL standards for waters in California. Failure to adopt standards for Oregon waters that are based on available data regarding the waters in Oregon is arbitrary and capricious and constitutes an abuse of discretion." The court denied all other bases for summary judgment as moot or advisory, and remanded the Temperature TMDL order to ODEQ for further review.

ODEQ now appeals from the court's entry of judgment for petitioner.

## II.   ANALYSIS

"We review the circuit court's rulings on cross-motions for summary judgment for errors of law, determining whether the summary judgment record shows that there are no genuine issues of material fact and that either party was entitled to judgment as a matter of law." *Fort Klamath Critical Habitat Landowners, Inc. v. Woodcock*, 334 Or App 509, 519, 557 P3d 543 (2024).

Here, the parties' arguments are based on provisions in the federal Clean Water Act and Oregon's water pollution control law and its implementing regulations. However, we reach the parties' arguments only with respect to the regulations. In interpreting Oregon regulations, we follow our well-established methodology of considering the text of the provision in context. *Tualatin Riverkeepers v. DEQ*, 235 Or App 132, 144, 230 P3d 559, *rev den*, 349 Or 173 (2010) (explaining that we apply the same analytical framework that we apply to the construction of statutes). When interpreting state regulations, we "defer[] to an agency's interpretation of its own regulation if that interpretation is a plausible one and otherwise consistent with the law." *Oil Re-Refining Company v. EQC*, 361 Or 1, 11, 388 P3d 1071 (2017).

The parties disagree whether we should start our analysis with state law or with federal law. However, "[i]n general, we consider whether actions are consistent with state

law before examining consistency with federal law." *Etter v. Dept. of Rev.*, 360 Or 46, 52, 377 P3d 561 (2016). Petitioner, which advocates starting with federal law, has not presented us with a persuasive reason to depart from that general approach. Accordingly, we proceed to first address whether ODEQ was authorized under state law to apply the California water quality standards at the Oregon-California border for purposes of establishing the Temperature TMDL. Because we conclude that ODEQ exceeded its authority under the applicable regulations, we do not address federal law.

When establishing a TMDL, ODEQ is required to include certain elements in the TMDL, as provided in OAR 340-042-0040(4). As relevant here, one of those elements is "[w]ater quality standards and beneficial uses." As provided in that rule, "[t]his element identifies the beneficial uses in the basin and the relevant water quality standards, including specific basin standards ***." OAR 340-042-0040(4)(c). .The parties disagree whether ODEQ was authorized to identify the California water quality standards as "the relevant water quality standards."

ODEQ argues that "relevant" has a broad meaning, such that it should consider any water quality standard that relates to the identified beneficial uses. Here, because the waterbodies cross from Oregon into California, ODEQ argues that California's standards for temperature, which are intended to protect fish, are relevant to how Oregon will protect that beneficial use upstream. The regulations also require that ODEQ determine the pollutant load that the waterbody can receive and still meet water quality standards. ODEQ argues that it is appropriate to consider downstream effects on the loading capacity of the waterbody. ODEQ further asserts that there is nothing in the text or context of the regulation that would narrow "relevant" to mean only those water quality standards that Oregon has promulgated.

To support its position, ODEQ also points to the state policies in Oregon's water pollution control law. First, ORS 468B.010(2) provides that "[t]he water pollution control laws of this state shall be liberally construed for the accomplishment of the purposes set forth in ORS 468B.015." In turn, ORS 468B.015 states in preamble that "the problem of

water pollution in this state is closely related to the problem of water pollution in adjoining states," and sets out as one of the objectives "[t]o cooperate with other agencies of the state, agencies of other states and the federal government in carrying out these objectives." Finally, ORS 468B.020(2) provides:

> "In order to carry out the public policy set forth in ORS 468B.015, [ODEQ] shall take such action as is necessary for the prevention of new pollution and the abatement of existing pollution by:
>
> "(a)   Fostering and encouraging the cooperation of the people, industry, cities and counties, in order to prevent, control and reduce pollution of the waters of the state; and
>
> "(b)   Requiring the use of all available and reasonable methods necessary to achieve the purposes of ORS 468B.015 and to conform to the standards of water quality and purity established under ORS 468B.048."

Petitioner responds that the statutes setting out policy objectives do not assist ODEQ's position because those statutes do not delegate authority to ODEQ to apply a water quality standard to Oregon waters that does not apply. With regard to the TMDL regulation, petitioner asserts that ODEQ's interpretation is not plausible because a "relevant" water quality standard is one that legally applies to the waterbody. Under Oregon law, water quality standards are established by rule by the Environmental Quality Commission (EQC). ORS 468B.048(1). As such, petitioner asserts that ODEQ cannot apply other standards on its own authority. Petitioner argues that the requirement that ODEQ identify the relevant water quality standards, OAR 340-042-0040(4)(c), is simply a directive that ODEQ identify the relevant Oregon water quality standards for the particular Oregon waterbody.

We are persuaded that ODEQ's construction of OAR 340-042-0040(4)(c) is not plausible, given the full text and context of the applicable regulations. We start with the text of OAR 340-042-0040(4)(c), which provides, in full:

> "(4)   A TMDL will include the following elements:
>
> "*****
>
> "(c)   Water quality standards and beneficial uses. This element identifies the beneficial uses in the basin and the

relevant water quality standards, including basin spe-
cific standards established in OAR 340-041-0202 through
340-041-0974. The beneficial use that is most sensitive to
impairment by the pollutant or pollutants addressed in the
TMDL will be specified."

OAR 340-042-0040(4)(c). The terms "water quality standards"
or "the relevant water quality standards" are not defined by
statute or regulation. However, in context, the water quality
standards to be identified are the ones that are relevant to
the beneficial uses in the basin and that are specific to the
basin. "Relevant" means "bearing upon or properly applying
to the matter at hand : affording evidence tending to prove or
disprove the matters at issue or under discussion." *Merriam-
Webster's Unabridged Dictionary*, https://unabridged.merriam-
webster.com/unabridged/relevant (accessed Oct 1, 2025). That
broad definition does not assist in our construction of the reg-
ulation. We do think use of the article "the" before relevant,
however, has some significance, because it suggests that,
in promulgating the rule, EQC had particular water qual-
ity standards in mind. If "relevant" were as broad as ODEQ
argues, the definite article "the" would have been omitted
(such that it read "identifies the beneficial uses in the basin
and relevant water quality standards"). In interpreting a
rule, we cannot ignore the words used. Thus, we turn to the
broader context found in the TMDL rules to determine what
are the relevant water quality standards.

　　　　　The first rule in the set of rules that apply to TMDLs
sets out the "Policy, Purpose and Effect." That rule provides:

"(1)   The public policy of the State of Oregon is to pro-
tect, maintain and improve the quality of waters of the
state for beneficial uses and to provide for prevention,
abatement and control of water pollution. To achieve and
maintain water quality standards, the EQC may impose
limitations and controls including Total Maximum Daily
Loads (TMDLs), wasteload allocations for point sources
and load allocations for nonpoint sources.

"(2)   The policy of the EQC is to establish, or have DEQ
establish TMDLs, including wasteload and load alloca-
tions, and have responsible sources meet these allocations
through compliance with discharge permits or other strat-
egies developed in sector or source-specific implementation

plans. These measures must achieve and maintain water quality standards and restore waters of the state that are water quality limited.

"(3)   These rules establish procedures for developing, issuing and implementing TMDLs as required by the [federal Clean Water Act] and authorized by Oregon statutes to ensure that state water quality standards are met and beneficial uses protected.

"(4)   DEQ will review any changes to [federal Clean Water Act] Section 303(d) or implementing regulations in 40 CFR Part 130 promulgated after the effective date of these rules. DEQ may subsequently recommend that the EQC amend, repeal or adopt new rules. Rules adopted by the EQC remain in effect until the EQC takes action on the recommendations."

OAR 340-042-0025.

In general, that rule sets out a broad policy to improve water quality in waters of the state for beneficial uses and to achieve and maintain water quality standards. However, the focus narrows in OAR 340-042-0025(3), which provides that the purpose of TMDLs are "to ensure that *state water quality standards are met* and beneficial uses protected." That purpose is echoed in the definition of TMDL, which is

> "a written quantitative plan and analysis for attaining and maintaining water quality standards and includes the elements described in OAR 340-042-0040. These elements include a daily load calculation of the maximum amount of a pollutant that a waterbody can receive and *still meet state water quality standards*, allocations of portions of that amount to the pollutant sources or sectors, and a Water Quality Management Plan to achieve water quality standards."

OAR 340-042-0030(15). That definition also refers specifically to state water quality standards as the standard to be achieved when setting the loading capacity for a waterbody. That is important because the purpose in identifying relevant water quality standards in OAR 340-042-0040(4)(c) is so that loading capacity for the waterbody can be set to meet those water quality standards, OAR 340-042-0040(4)(d), and are the water quality standards that the WQMP must seek to achieve and maintain, OAR 340-042-0040(4)(l).

     In the broader understanding of the word "relevant," we agree in concept that California's water quality standards are relevant to the beneficial uses in Oregon in the Upper Klamath and Lost River subbasins where those waterbodies cross over into California. However, we must consider the relevancy of the standards in the complete context of the purpose of the TMDL. A TMDL does not just identify any water quality standard that may be relevant to the beneficial uses of the waterbodies as something to take into consideration; it identifies "the relevant" water quality standards for the purpose of setting the TMDL at a level necessary to achieve those identified water quality standards. Although the two rules quoted above are the only instances where the EQC specified "state" water quality standards in the TMDL rules, those two uses were specifically made with the purpose of a TMDL in mind, which we find to be particularly important context. Reading the TMDL rules as a whole, they are designed to establish TMDLs that attain and maintain Oregon water quality standards. We conclude that ODEQ adopted an implausible reading of OAR 340-042-0040(4)(c) when it identified California water quality standards in the Temperature TMDL as standards to be achieved in Oregon waters (even if only at the Oregon-California border).

     We are not persuaded by ODEQ's references to OAR 340-041-0028(2)[6] and OAR 340-041-0007(1)[7] as a basis on

---

[6] OAR 340-041-0028(2) provides:

    "(2) Policy. It is the policy of the Commission to protect aquatic ecosystems from adverse warming and cooling caused by anthropogenic activities. The Commission intends to minimize the risk to cold-water aquatic ecosystems from anthropogenic warming, to encourage the restoration and protection of critical aquatic habitat, and to control extremes in temperature fluctuations due to anthropogenic activities. The Commission recognizes that some of the State's waters will, in their natural condition, not provide optimal thermal conditions at all places and at all times that salmonid use occurs. Therefore, it is especially important to minimize additional warming due to anthropogenic sources. In addition, the Commission acknowledges that control technologies, best management practices and other measures to reduce anthropogenic warming are evolving and that the implementation to meet these criteria will be an iterative process. Finally, the Commission notes that it will reconsider beneficial use designations in the event that man-made obstructions or barriers to anadromous fish passage are removed and may justify a change to the beneficial use for that water body."

[7] OAR 340-041-0007(1) provides:

    "Notwithstanding the water quality standards contained in this Division, the highest and best practicable treatment and/or control of wastes,

which to include California's water quality standards in the Temperature TMDL. Those rules are water quality standards established by EQC. However, ODEQ did not identify those rules in the Temperature TMDL as relevant water quality standards. We do not readily perceive a legal basis on which we could conclude that those unidentified state water quality standards now apply to the Temperature TMDL, and ODEQ does not provide us with one.

In so concluding, we emphasize that, here, ODEQ applied in the Temperature TMDL another state's water quality standards to waters in Oregon without EQC having gone through a process to adopt those standards as Oregon water quality standards. *See* ORS 468B.048(1) ("The Environmental Quality Commission by rule may establish standards of quality and purity for the waters of the state in accordance with the public policy set forth in ORS 468B.015."). That was not permitted under the TMDL rules. We thus affirm the circuit court's grant of summary judgment to petitioner on its Count 4, although on a different basis than the circuit court.[8]

Affirmed.

---

activities, and flows must in every case be provided so as to maintain dissolved oxygen and overall water quality at the highest possible levels and water temperatures, coliform bacteria concentrations, dissolved chemical substances, toxic materials, radioactivity, turbidities, color, odor, and other deleterious factors at the lowest possible levels."

[8] To the extent the circuit court based its conclusions on a lack of evidence, and not on whether ODEQ had legal authority to include the California water quality standards, we agree with the parties that that basis was beyond the scope of the summary judgment motions before the court in this case.