No. 867 October 8, 2025 23

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

HORSEFLY IRRIGATION DISTRICT
and Langell Valley Irrigation District,
*Petitioners-Respondents,*

*v.*

DEPARTMENT OF ENVIRONMENTAL QUALITY,
an agency of the State of Oregon,
*Respondent-Appellant.*

Marion County Circuit Court
19CV12910; A179249 (Control)

LANGELL VALLEY IRRIGATION DISTRICT
and Horsefly Irrigation District,
*Petitioners-Respondents,*

*v.*

DEPARTMENT OF ENVIRONMENTAL QUALITY,
an agency of the State of Oregon,
*Respondent-Appellant.*

Marion County Circuit Court
19CV49828; A179250

J. Channing Bennett, Judge.

Argued and submitted December 4, 2023.

Carson L. Whitehead, Assistant Attorney General, argued the cause for appellant. Also on the briefs were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Steven L. Shropshire argued the cause for respondents. Also on the brief were Joseph A. Rohner IV and Jordan Ramis PC.

Before Ortega, Presiding Judge, and Lagesen, Chief Judge, and Powers, Judge.

ORTEGA, P. J.

Reversed and remanded.

**ORTEGA, P. J.**

In this "other than contested case," ORS 183.484, the Oregon Department of Environmental Quality (ODEQ) appeals from circuit court judgments that remanded two of its final orders that apply to the waters in the Upper Klamath and Lost River subbasins. The orders set a total maximum daily load (TMDL) for nutrients and for temperature discharged to the waterbodies in those subbasins.[1] In both of the final orders, ODEQ determined that irrigation districts with jurisdiction in the affected subbasins, which includes petitioners, were among the persons responsible for developing implementation plans for the two TMDLs. Petitioners challenged the TMDLs, arguing that ODEQ did not have legal authority to designate petitioners as "responsible persons." On cross-motions for summary judgment, the circuit court agreed with petitioners on that claim and remanded the orders to ODEQ for further consideration.[2] We conclude that, based on the text and context of the applicable regulations, ODEQ had legal authority to designate petitioners as responsible persons. Accordingly, we reverse and remand.

## I.   BACKGROUND

### A.   *Overview of the Regulatory Framework*

Under the federal Clean Water Act, states are required to establish a TMDL for a pollutant and for temperature for any waterbody that the state has identified as not meeting the applicable water quality standards for the waterbody. *See* 33 USC § 1313(d). In short, "a TMDL is the maximum amount of a pollutant allowed to enter a waterbody so that the waterbody will meet and continue to meet water quality standards for that pollutant." *Hayes Oyster Co. v. DEQ*, 316 Or App 186, 188, 504 P3d 15 (2021), *rev den*, 369 Or 507 (2022); *see also* OAR 340-042-0030(15)

---

[1] In a companion case, also decided this date, *PacifiCorp v. DEQ*, ____ Or App ___, ___ P3d ___ (2025), we address a different issue in a challenge to the same temperature TMDL issued by ODEQ.

[2] Petitioners raised other claims below that also challenged their designation as responsible persons in the TMDLs. Having granted relief on petitioners' first claim, the circuit court did not address those claims, and they are not before us on appeal.

(defining TMDL).[3] Oregon must submit TMDLs to the federal Environmental Protection Agency for approval. 33 USC § 1313(d)(2).

The regulations governing ODEQ's development of TMDLs are in OAR chapter 340, division 042.[4] Under those rules, it is the policy of the Environmental Quality Commission "to have [ODEQ] establish TMDLs, including wasteload and load allocations, and have responsible sources meet these allocations through compliance with discharge permits or other strategies developed in sector or source-specific implementation plans." OAR 340-042-0025(2). A "source" "means any process, practice, activity or resulting condition that causes or may cause pollution or the introduction of pollutants to a waterbody." OAR 340-042-0030(12). A "source" can be a "point source" or a "nonpoint source."[5] Wasteload allocations are "portions of the receiving water's loading capacity that are allocated to existing point sources of pollution[.]" OAR 340-042-0040(4)(g). Load allocations are "portions of the receiving water's loading capacity that are allocated to existing nonpoint sources * * *. Load allocations are best estimates of loading, and may range from reasonably accurate estimates to gross allotments depending on the availability of data and appropriate techniques for predicting loading." OAR 340-042-0040(4)(h).

---

[3] A TMDL is defined as

"a written quantitative plan and analysis for attaining and maintaining water quality standards and includes the elements described in OAR 340-042-0040. These elements include a daily load calculation of the maximum amount of a pollutant that a waterbody can receive and still meet state water quality standards, allocations of portions of that amount to the pollutant sources or sectors, and a Water Quality Management Plan to achieve water quality standards."

OAR 340-042-0030(15).

[4] The TMDLs at issue here were established in 2019. Several of the applicable rules in OAR chapter 340, division 042 were amended in 2022. However, those amendments did not make substantive changes to the rules at issue here and do not affect our analysis. As a result, we cite to the current version of the rules in this opinion.

[5] A point source "means a discernible, confined, and discrete conveyance * * * from which pollutants are or may be discharged. Point source does not include agricultural storm water discharges and return flows from irrigated agriculture." OAR 340-041-0002(46). A nonpoint source "means any source of water pollution other than a point source. Generally, a nonpoint source is a diffuse or unconfined source of pollution where wastes can either enter into waters of the state or be conveyed by the movement of water into waters of the state." OAR 340-041-0002(42).

In establishing a TMDL, ODEQ is required to include certain elements, which are specified in OAR 340-042-0040(4). Among those elements are "the amount of a pollutant or pollutants a waterbody can receive and still meet water quality standards," "to the extent existing data allow, the difference between the actual pollutant load in a waterbody and the loading capacity of that waterbody," the identity of pollutant sources or source categories, wasteload and load allocations for those sources, and a water quality management plan (WQMP). OAR 340-042-0040(4)(d) - (h), (l). The element of "sources or source categories" is further defined to provide that it "identifies the pollutant sources and estimates, to the extent existing data allow, the amount of actual pollutant loading from these sources. The TMDL will establish wasteload allocations and load allocations for these sources. [ODEQ] will use available information and analyses to identify and document sources." OAR 340-042-0040(4)(f).

In turn, ODEQ must include certain elements in the WQMP, which is "the element of a TMDL describing strategies to achieve allocations identified in the TMDL to attain water quality standards." OAR 340-042-0030(17). The elements of a WQMP, as relevant here, include "[i]dentification of persons, including Designated Management Agencies (DMAs), responsible for implementing the management strategies and developing and revising sector-specific or source-specific implementation plans." OAR 340-042-0040(4)(l)(G); *see also* OAR 340-042-0080(1) ("WQMPs will identify the sector and source-specific implementation plans required and the persons, including DMAs, responsible for developing and revising those plans."). A sector-specific or source-specific implementation plan, "in the context of a TMDL means a plan for implementing a Water Quality Management Plan for a specific sector or source not subject to permit requirements in ORS 486.050." OAR 340-042-0030(11).

B.  *Petitioners*

Petitioners are both irrigation districts, formed under ORS chapter 545, and operate within the Lost River subbasin, which is located on the eastside of the U.S. Bureau of Reclamation's Klamath Reclamation Project. Under ORS

174.116(2)(w), irrigation districts are "local service districts," which in turn, under ORS 174.116(1), are recognized as local governments. Among other things, irrigation districts are empowered to "enter upon land of a water user of the district for inspection, maintenance and regulation of ditches, pipelines, gates, pumps or other water works." ORS 545.237(1).

Petitioner Horsefly Irrigation District delivers water to about 10,000 acres of land, and the delivery system consists of open canals and sealed pipelines. In addition to owning, operating, and maintaining that conveyance system, Horsefly operates and maintains Harpold Reservoir. Petitioner Langell Valley Irrigation District delivers water to about 18,600 acres of land, and its delivery system consists of open canals, sealed pipelines, and a drainage system that conveys return flows from agricultural activities back to Lost River. Langell's conveyance system and a portion of the drainage system is owned by the U.S. Bureau of Reclamation and is operated and maintained by Langell pursuant to a contract with the Bureau of Reclamation. Langell also operates three dams owned by the Bureau of Reclamation pursuant to contracts and maintains one of those dams.

## C.   *The TMDL Orders*

In January 2019, ODEQ issued the Upper Klamath and Lost River Subbasins Nutrient TMDL and Water Quality Management Plan (Nutrient TMDL), and in September 2019 issued the Upper Klamath and Lost River Subbasins Temperature TMDL and Water Quality Management Plan (Temperature TMDL).[6] Those TMDL orders specifically identified petitioners, among others, as "responsible persons" for developing a source-specific implementation plan "to address load allocations identified in the TMDLs."

For purposes of this opinion, we focus on the sections of the TMDLs that discuss ODEQ's designation of petitioners as sources and persons responsible for developing a source-specific implementation plan. Because the TMDL orders are lengthy and, in parts, highly technical

---

[6] In the TMDL orders, ODEQ sometimes refers to the applicable subbasin as "Lost" and sometimes as "Lost River." For consistency, we refer to the subbasin throughout as "Lost River."

documents, our description is meant only as a high-level summary to aid in understanding our disposition.

    1.   *Nutrient TMDL*

        In the Nutrient TMDL, ODEQ addressed physical and biological processes that caused water quality impairment for dissolved oxygen, pH, chlorophyll *a*, and ammonia toxicity. ODEQ explained that "[m]anagement of water within the federal irrigation project is largely controlled by individual irrigation and drainage districts," which ODEQ collectively terms, "water management districts." Petitioners are specifically identified as among those districts.

        In the section discussing the Lost River subbasin, ODEQ conducted a source assessment and identified existing sources of pollutants to include agriculture, irrigation return flows, and reservoir and impoundment operations. In brief, ODEQ explained that the major sources of the pollutants of concern were water runoff from farms, rangeland, forest, and urban lands, as well as wastewater, stormwater, failing septic systems, and animal waste runoff. In addition, delivery of pollutants "can occur through tributaries, canals, drains and shallow and deep groundwater," and "combining irrigation and artificial drainage networks may exacerbate the ecological effects of agricultural runoff by increasing direct connectivity between fields and streams and minimizing potentially mitigating effects of longer subsurface pathways." ODEQ included water quality data that showed pollutant concentrations in several locations in the Lost River system. Using water modeling, ODEQ quantified source pollutant loading and determined the reduction needed to attain water quality standards. ODEQ also set out load allocations for pollutants on a river segment basis.

        In the WQMP for the Nutrient TMDL, ODEQ stated that "Water Management Districts are Responsible Persons responsible for source-specific implementation plans," and "recognize[d] that organizations are not responsible for land use activities or load allocations outside of their area of jurisdictional authority." Specifically, in Table 4-4, among others identified are "Water Management Districts" with an area of jurisdiction of "[c]anals and drains within the Klamath

Reclamation Project." The WQMP further provides that "[i]rrigation and drainage districts are Responsible Persons responsible for developing implementation plans to address load allocations associated with non-federal water delivery and drainage systems in the Klamath Reclamation Project." ODEQ recommended that "water management districts develop a unified implementation plan," but also recognized that individual districts could choose to develop their own plans.

2. *Temperature TMDL*

In the Temperature TMDL, ODEQ identified heat from human activities or anthropogenic sources as the pollutant of concern, which includes, among other things "heat from modification to flow rate or volume" and "heat from reservoirs and irrigation ditches which, through their operations, increase water temperatures or modify thermal regimes in downstream river reaches." The TMDL identified existing sources of heat to "include warming and heat input from natural sources; human land management practices; water management district operations; dam and reservoir operations, and hydromodification. These nonpoint sources influence the quantity and timing of heat delivery to downstream river reaches."

Petitioners are identified in the Temperature TMDL as water management districts in the Klamath River Basin, and more specifically, in the Lost River subbasin. The Temperature TMDL identifies and discusses several activities of those sources that could lead to warmer stream temperatures in the Lost River subbasin, including diversion of water from a stream to a ditch or canal, warmer water from open ditches mixing with natural stream flows, and warmer irrigation return flows from a field after irrigation. ODEQ set out the available data for temperature in the subbasin and also set out load allocations for the Lost River subbasin as allocations to background, nonpoint, and point sources by setting out allocations on Lost River tributaries and Lost River.

As relevant here, the Temperature TMDL provides with respect to "responsible persons":

> "Various water management districts comprised of drainage and irrigation districts are identified in the WQMP as responsible persons that have responsibility for developing source specific implementation plans to address [load allocations] associated with the operations and management of water delivery and drainage systems in the Klamath Reclamation Project.

> "As responsible persons, [O]DEQ is requiring the water management districts develop a unified or district-specific implementation plan ***."

Specific to water management districts, the WQMP explains that they are included as responsible persons "because maintenance and management of these systems could impact temperature. Such systems are responsible only for temperature effects resulting from conveyance systems, not from upland agricultural activities."

D. *Proceedings Below*

Petitioners challenged ODEQ's TMDL orders in circuit court, bringing several claims as a basis for the court to determine that the orders were unlawful. Because the circuit court ruled only on the merits of plaintiff's first claim for relief, we address only that claim. In its operative petition, petitioners asserted in its first claim that ODEQ unlawfully designated petitioners as "responsible persons" because "[p]etitioners lack legal authority to impose water quality regulations on discharges to state waters from sector-specific and/or source-specific irrigation activities on private lands or to regulate the activities of private irrigators."

ODEQ moved for summary judgment, and petitioners cross-moved for summary judgment. As relevant to petitioners' first claim for relief, ODEQ first clarified that the TMDL orders did not require petitioners to regulate activities on private land; they obligated petitioners only to mitigate pollution within their jurisdiction, that is, the drains and canals they controlled. Based on the TMDL regulations, ODEQ argued that it was required to designate all persons responsible for sources of the pollutants. Here, ODEQ determined that petitioners' irrigation and drainage infrastructure could contribute to water quality impairment and, thus, ODEQ argued, it was required to include a

management strategy for that source category and identify persons responsible. ODEQ reasoned that petitioners must have jurisdiction over their own irrigation infrastructure so "there is no alternative to the conclusion that they must develop the implementation plan under OAR 340-042-[0]080 and that they are persons who are responsible for doing so under OAR 340-042-0040."

For their part, petitioners argued on their first claim for relief that ODEQ acted outside its authority by creating the new term "responsible person" and applying it to petitioners. Petitioners argued that ODEQ engaged in circular logic to conclude that OAR 340-042-0040(4)(l)(G) allowed to it create "the new jurisdictional term 'responsible person,' which [ODEQ] can apply to water management districts *** without undertaking any other analysis as to whether those districts cause the pollution that is the subject of the TMDL."

In its letter opinion, the court read OAR 340-042-0040(4)(l)(G) to mean "persons responsible are those with legal authority to enforce the management strategies." The court rejected ODEQ's reasoning, calling ODEQ's definition of responsible persons "vague and circular," and stated that ODEQ did not assert that petitioners were sector- or source-specific polluters, but instead said that they "could be" polluters. The court further stated that

> "[O]DEQ does not cite any statute or regulation that empowers any of the [p]etitioners to enforce implementation plans. The 'Responsible Person' definition proffered by [O]DEQ is so broad that it applies to anyone [O]DEQ deems, even without specific findings, may have some impact on water quality regardless of the 'Responsible Persons' legal authority or ability to develop or enforce an implementation plan. [O]DEQ's term 'responsible person' is vague and overbroad. Accordingly, Count 1 is remanded to [O]DEQ for further consideration."

The court denied all other bases for summary judgment as moot or advisory, and remanded the TMDL orders to ODEQ.

ODEQ now appeals from the court's entry of judgment for petitioners.

## II.   ANALYSIS

"We review the circuit court's rulings on cross-motions for summary judgment for errors of law, determining whether the summary judgment record shows that there are no genuine issues of material fact and that either party was entitled to judgment as a matter of law." *Fort Klamath Critical Habitat Landowners, Inc. v. Woodcock*, 334 Or App 509, 519, 557 P3d 543 (2024). In addressing ODEQ's authority in this case, which is grounded in the regulations governing TMDLs, we apply our usual methodology for construing regulations by considering the text of the rule in context. *Tualatin Riverkeepers v. DEQ*, 235 Or App 132, 144, 230 P3d 559, *rev den*, 349 Or 173 (2010) (explaining that we apply the same analytical framework that we apply to the construction of statutes). When interpreting state regulations, we "defer[] to an agency's interpretation of its own regulation if that interpretation is a plausible one and otherwise consistent with the law." *Oil Re-Refining Company v. EQC*, 361 Or 1, 11, 388 P3d 1071 (2017). Based on the express text and context of the relevant regulations, we conclude that ODEQ's interpretation of those regulations in the TMDL orders is plausible.

We start with the text of the regulations most relevant to the issue here. As set out above, under OAR 340-042-0040, ODEQ is required to include certain elements in a TMDL. One of those elements is the identification of "sources or source categories." A "source" is "any process, practice, activity or resulting condition that causes or may cause pollution or the introduction of pollutants to a waterbody." OAR 340-042-0030(12). For the element of "sources or source categories," ODEQ "identifies the pollutant sources and estimates, to the extent existing data allow, the amount of actual pollutant loading from these sources. The TMDL will establish wasteload allocations and load allocations for these sources. [ODEQ] will use available information and analyses to identify and document sources." OAR 340-042-0040(4)(f). In turn, "load allocations" are "portions of the receiving water's loading capacity that are allocated to existing nonpoint sources ***. Load allocations are best estimates of loading, and may range from reasonably accurate

estimates to gross allotments depending on the availability of data and appropriate techniques for predicting loading. \* \* \*." OAR 340-042-0040(4)(h).

ODEQ is also required to include in a TMDL a WQMP which is "the element of a TMDL describing strategies to achieve allocations identified in the TMDL to attain water quality standards." OAR 340-042-0030(17). One of the elements of a WQMP is "[i]dentification of persons, including Designated Management Agencies (DMAs), responsible for implementing the management strategies and developing and revising sector-specific or source-specific implementation plans." OAR 340-042-0040(4)(l)(G); *see also* OAR 340-042-0080(1) ("WQMPs will identify the sector and source-specific implementation plans required and the persons, including DMAs, responsible for developing and revising those plans.").

Based on those regulations, as a starting point, we reject the circuit court's conclusions, and petitioners' arguments, that ODEQ did not have authority at all to designate "responsible persons" in the TMDLs because that term is not a defined term in the regulations or is "vague and overbroad." As we read the TMDL orders in this case, ODEQ used the term responsible person as shorthand for the persons it had identified as responsible for source-specific implementation plans. As explained above, ODEQ must include in the WQMP the "[i]dentification of persons, including Designated Management Agencies (DMAs), responsible for implementing the management strategies and developing and revising sector-specific or source-specific implementation plans." OAR 340-042-0040(l)(G). By choosing to use the shorthand term "responsible persons" for that category of persons, who are not DMAs, that are responsible for source-specific implementation plans, ODEQ was not using circular or vague reasoning, nor was it creating some new category of persons responsible for TMDL implementation. It was using an easy-to-understand shorthand term for a category of persons it was required by regulation to identify in the WQMPs.[7] Further, petitioners have not challenged the regulation itself.

---

[7] For the same reasons, we reject petitioners' argument that ODEQ could not use the term "responsible person" in the TMDL orders without first engaging in a rulemaking process to define it.

Also based on those regulations, we conclude that ODEQ had legal authority to designate petitioners as persons responsible for source-specific implementation plans in the TMDLs. When identifying sources, ODEQ is required to identify "*any* process, practice, activity or resulting condition *that causes or may cause* pollution or the introduction of pollutants to a waterbody." OAR 340-042-0030(12) (emphases added). Further, ODEQ is to base that identification of sources on "available information" and estimate "to the extent existing data allow" the amount of pollutant from those sources, OAR 340-042-0040(4)(f), and the load allocations are "best estimates of loading, and may range from reasonably accurate estimates to *gross allotments* depending on the availability of data and appropriate techniques for predicting loading," OAR 340-042-0040(4)(h) (emphasis added).

It is undisputed that petitioners own, operate, and maintain irrigation and drainage canals and impoundments in the Lost River subbasin. In the Nutrient TMDL, ODEQ explained that "[m]anagement of water within the federal irrigation project is largely controlled by individual irrigation and drainage districts," and ODEQ specifically identified as sources of pollution management practices engaged in by water management districts, including irrigation and drainage connections and water impoundments in the Lost River subbasin. The WQMP then identified petitioners as responsible persons with respect to canals and drains in the Klamath Reclamation Project. In the Temperature TMDL, ODEQ specifically identified water management district operations as a source of pollution, including dams, diversions, and irrigation and drainage ditches. Petitioners were identified as water management districts in the Klamath River Basin and, more specifically, in the Lost River subbasin.

Thus, both TMDL orders identified petitioners as sources of pollutants governed by the TMDLs in the Lost River subbasin where petitioners have jurisdiction. ODEQ explained in the TMDL orders how irrigation operations are sources of pollution, estimated the amount of pollution from those sources in particular waterbody segments, and then based load allocations on allotments to those

waterbody segments. ODEQ provided citations for its data and modeling.

Contrary to the circuit court's conclusion and petitioners' arguments on appeal, the governing regulations did not require ODEQ to make findings that petitioners' specific facilities are causing a specific amount of pollution. Instead, the express text of the regulations provide that a source is *any* activity that *may cause* the introduction of pollutants to a waterbody. OAR 340-042-0030(12). ODEQ identified the activities, which include activities petitioners engage in, that are causing the introduction of pollutants in the Lost River subbasin. ODEQ is to identify sources based on available information and identify load estimates from sources "to the extent existing data allow." In identifying petitioners as sources, ODEQ applied the text of the regulations in a plausible manner.

Having identified petitioners as sources, the TMDLs also identify petitioners as persons responsible, either individually or on a cooperative basis with other districts, to develop source-specific implementation plans within their own jurisdiction. It is undisputed that petitioners own, operate, and maintain various irrigation, drainage, and impoundment facilities in the Lost River subbasins. And as irrigation districts they are empowered to, among other things, "enter upon land of a water user of the district for inspection, maintenance *and regulation* of ditches, pipelines, gates, pumps or other water works." ORS 545.237(1) (emphasis added). We perceive no basis on which to conclude that petitioners do not have regulatory authority over the facilities that they own, maintain, and operate—and petitioners do not offer such a basis. Instead, petitioners assert they do not have authority to enforce regulatory actions on private land or for facilities and structures they do not own or control. But nothing in the TMDL orders require such actions from petitioners. ODEQ had legal authority to require petitioners, as sources of the pollutants addressed in the TMDLs, to be responsible for developing source-specific implementation plans within their areas of jurisdiction.

To the extent petitioners' arguments are more properly grounded in the idea that ODEQ's decisions were not

supported by substantial evidence, or its corollary substantial reason, those arguments are beyond the scope of this appeal. The circuit court granted summary judgment based on its conclusion that ODEQ lacked legal authority to designate petitioners as responsible persons. As to that conclusion, we conclude that the circuit court erred as a matter of law. Accordingly, we reverse and remand.

Reversed and remanded.